SPARKS FARM, INC. AND LOUISE SPARKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sparks Farm, Inc. v. Commissioner
Docket No. 15422-84
United States Tax Court
T.C. Memo 1988-492; 1988 Tax Ct. Memo LEXIS 518; 56 T.C.M. (CCH) 464; T.C.M. (RIA) 88492; October 12, 1988
Mark J. Klein, for the petitioners. James E. Cannon, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: By separate notices of deficiency respondent determined deficiencies in petitioners' Federal income tax as follows: [1] Petitioners Year
Deficiencies
Louise Sparks
1979
$ 1,878.49
1980
9,497.52
Sparks Farm, Inc.
1979
1,276.65
1980
546.66
*520 The issues for decision are: (1) Whether a corporation, which the individual petitioner incorporated and to which she deeded over a farm for estate planning purposes, is a separate legal entity and taxable for income tax purposes; (2) If the corporation is a taxable entity, whether the corporation nonetheless acted as the alter ego of or as an agent for the individual petitioner during the years in issue; (3) Whether the corporation is a legal corporation for Federal tax purposes if it did not comply with some of the Missouri statutory guidelines after its incorporation; (4) Whether the corporation held bar legal title to the farm as a trustee under a resulting trust for the individual petitioner as the beneficial owner; (5) Whether the individual petitioner retained a life estate in the farm when she transferred the farm to the corporation; (6) Whether *521 the individual petitioner as the farm manager is entitled under section 482 [2] to a management fee and a commission from the sale of part of the corporation's land, which amounts would be taxable to her and deductible by the corporation; (7) Whether the corporation must report as taxable income under section 482 the fair rental value of a residence that the individual taxpayer, as the farm manager, occupied; (8) Whether the individual petitioner is entitled to interest deductions in 1979 and 1980, and if so the amounts thereof; and (9) Whether the individual petitioner received constructive dividends from the corporation each year, and if so the amount thereof. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. The individual petitioner, *522 Louise Sparks (Mrs. Sparks), resides at Route 5, Unionville, Missouri. Mrs. Sparks filed Federal income tax returns (Forms 1040) for the taxable years 1979 and 1980 with the Internal Revenue Service Center, Kansas City, Missouri. The corporate petitioner, Sparks Farm, Inc., is a corporation organized and existing under the laws of the State of Missouri with its principal place of business located at Route 5, Unionville, Missouri. Sparks Farm, Inc. filed Federal corporate income tax returns (Forms 1120) for the taxable years 1979 and 1980 with the Internal Revenue Service Center, Kansas City, Missouri. Upon her husband's death in 1973, Mrs. Sparks inherited a 540-acre farm, called Sparks Farm, located in Putnam County, Missouri. Mrs. Sparks resided on this farm from the time she inherited the property up through the time of the trial. While approximately 150 acres of this farm were suitable for crops, the rest of the land was used as pasture and for timber. The crop acreage was farmed under share-crop arrangements with unrelated third parties, in which the landlord provided all of the lime and some other miscellaneous items, [3] and the tenants provided all of the machinery, *523 equipment, fuel, labor, and any other expenses. Crop income was divided equally between the landlord and the tenants. All of the pasture land was rented out for cash. Shortly after Mrs. Sparks inherited the farm, she began discussing with her attorney, Robert M. Gifford, her concern over the possible estate taxes that her daughter would have to pay on the farm upon Mrs. Sparks' death. Mr. Gifford was with the law firm, Gifford & Simmons, in Green City, Missouri. Mrs. Sparks wanted to save estate taxes for her daughter by making lifetime gifts of interests in this *524 farm to her daughter, Terry Campbell, and to Mrs. Campbell's only child at the time, Nicole Campbell, and any later-born grandchildren. During the course of several meetings, Mr. Gifford advised Mrs. Sparks that she could reduce the assets in her estate that would be subject to estate taxes by establishing a corporation, transferring the farm to the corporation, and giving lifetime gifts of shares of stock to Mrs. Campbell and the grandchildren from time to time. The record does not establish whether or not Mr. Gifford discussed other alternatives. [4] Mr. Gifford explained that, through the use of a corporation, Mrs. Sparks could more easily give lifetime gifts of shares of stock to her family than by going through the formality of preparing and recording deeds each time she made a gift of land. Although Mrs. Sparks wanted to make liftetime gifts and believed that the donees would own part of the land through these gifts of shares, she professed to believe that somehow they would not own any of the land until her death. [5]
*525 With the assurance of Mr. Gifford, Mrs. Sparks incorporated Sparks Farm, Inc. in Missouri on August 5, 1977. Up to the time of trial Sparks Farm, Inc. existed as a valid corporation under the laws of Missouri. At the time Mr. Gifford helped Mrs. Sparks set up the corporation, he did not advise Mrs. Sparks as to the income tax consequences of incorporation. Instead, as he does with all of his clients, Mr. Gifford gave no advice on tax matters and recommended that she seek advice from her tax accountant or someone in the tax field with regard to the income tax consequences of incorporation. After incorporating Sparks Farm, Inc., however, Mrs. Sparks did not seek the advice of anyone knowledgeable about income tax. Mrs. Sparks herself is not familiar with the tax laws and has never prepared an income tax return. Mrs. Sparks' individual and Sparks Farm, Inc.'s corporate income tax returns for 1979 and 1980 were prepared by Dale Ream, a paid return preparer from Unionville, Missouri. From the time Sparks Farm, Inc. was first incorporated to the time of trial, Sparks Farm, Inc. had elected officers, held corporate meetings, maintained minutes of corporate meetings, paid its annual *526 franchise taxes, filed annual registration reports, and maintained itself in good standing with the State of Missouri. Sparks Farm, Inc. held its first shareholders' meeting on August 19, 1977 at the law offices of Gifford & Simmons. At the meeting Mrs. Sparks was elected chairman and Mr. Gifford was elected secretary of the meeting. Mrs. Sparks was the sole shareholder at that time and was elected director of the corporation. The Articles of Incorporation were approved and the Bylaws were adopted at this meeting on August 19, 1977. The Articles of Incorporation enumerated the reasons for forming the corporation, including: 1. To buy, sell, own, handle and deal in generally cattle, livestock and animals of all kind, farm products, fertilizers, and all products and services relating or incidental thereto, at wholesale, retail, or otherwise, and to act as a rancher, farmer, dealer, grower or handler of any and all of the foregoing. 2. To own, hold, manage, encumber, improve, exchange, buy, sell, lease, rent and generally deal in farm real estate and to engage in farming, it being the express intent and purpose that these activities fall within the purview of and be limited *527 by the provisions of Chapter 350 VAMS.
There followed another 12 paragraphs spelling out in great detail the various objects and powers of the corporation, concluding with the following: 15. The foregoing clauses shall be construed both as objects and powers, and it is especially provided that the foregoing enumerated clauses or special powers shall not be held to limit or restrict in any manner the general powers of this corporation. The Articles of Incorporation for Sparks Farm, Inc. stipulated that the board of directors would consist of two directors and that the corporation's duration would be perpetual. The Certificates of Incorporation noted that the amount of Sparks Farm, Inc.'s authorized shares was 3,000 shares of common stock at $ 10 par value. The first meeting of the board of directors of Sparks Farm, Inc. was also held on August 19, 1977. At that meeting Mrs. Sparks was elected chairman and Mr. Gifford was elected secretary of the meeting. Mrs. Sparks was elected president and treasurer while Mr. Gifford was elected secretary of the corporation. At this meeting the officers of Sparks Farm, Inc. were directed to pay the expenses incurred in the organization *528 of the corporation out of corporate funds. A stock certificate was presented to the meeting and adopted as the form for the certificates of stock of the corporation. One qualifying share of stock (Certificate #1) was then issued to Mr. Gifford, canceled and reissued (Certificate #2) to Mrs. Sparks. A special meeting of the board of directors of Sparks Farm, Inc. was held on September 16, 1977. This meeting was held to approve and adopt a plan to offer 3,000 shares of common stock, amounting to $ 30,000, for sale under section 1244. However, no stock was ever offered for sale or sold. On November 11, 1977, Mrs. Sparks conveyed Sparks Farm to the corporation by a General Warranty Deed. In consideration for the conveyance of the farm to the corporation, Mrs. Sparks intended that the 3,000 authorized shares of stock be issued to her. This was never formally accomplished, but Mrs. Sparks as sole shareholder owned all of the shares and dealt with them as her sole property, except for certain shares she later gifted to her daughter and grandchildren. The General Warranty Deed noted that Mrs. Sparks conveyed the farm to Sparks Farm, Inc. "TO HAVE AND TO HOLD the premises aforesaid *529 with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the said party of the Second Part [Sparks Farm, Inc.], and its heirs and assigns, FOREVER * * *" In addition, the warranty specified that Mrs. Sparks "is lawfully seized of an indefeasible Estate in Fee in the premises herein conveyed; that she has good right to convey the same; and that the said premises are free and clear of any encumbrance * * *." The Warranty continued that Mrs. Sparks "will WARRANT AND DEFEND the title to the said premises unto the said party of the Second Part [Sparks Farm, Inc.], and unto its heirs and assigns, FOREVER, against the lawful claims and demands of all persons whomsoever." This General Warranty Deed was filed with the Putnam County, Missouri Recorder of Deeds. Although Mrs. Sparks owned farm machinery, equipment, and cattle at the time of this transfer, the farm itself was the only item conveyed to Sparks Farm, Inc. The other assets were sold by Mrs. Sparks over the next few years. That farm machinery and equipment had not been used for the farming operation either before or after the conveyance of the farm to the corporation, *530 the sharecropper having at all times supplied all necessary machinery and equipment. On the day of the conveyance of the farm to the corporation, November 11, 1977, shares of Sparks Farm, Inc. stock were issued as follows: Individual Receiving
Shares
Certificate #
Number of Shares
Terry Campbell
3
1,000
Terry Campbell
5
100
Nicole Campbell
4
100
After conveying the farm to the corporation, Mrs. Sparks continued to live on the farm. Just as she had done before deeding the farm to the corporation, Mrs. Sparks did not personally engage in any farming activity, but continued to act merely as the farm manager. As manager of the farm, Mrs. Sparks collected pasture rent twice a year and the farm's share of the crops once a year, and paid any bills for seed or other items. See n.3, supra. Mrs. Sparks was not paid a salary by the corporation to act as the farm manager. In addition, she had no information or knowledge as to what managers in the area charged for their services. All of the sharecroppers and renters on the farm continued to pay their rent or crop shares to Mrs. Sparks rather than to the corporation. These individuals probably were not *531 aware that the corporation existed or that the farm had been conveyed to the corporation, although the General Warranty Deed was a matter of public record. From the date of incorporation up until September 5, 1980, Mrs. Sparks deposited all income from the operation of Sparks Farm, Inc. into her personal checking account and used the money for her own personal purposes. She also paid Sparks Farm, Inc.'s expenses from her personal checking account up until September 5, 1980. After helping Mrs. Sparks to incorporate Sparks Farm, Inc., Mr. Gifford believed the corporation, rather than Mrs. Sparks, owned and operated the farm. From January 11, 1978 to September 29, 1980, Mr. Gifford sent his bills to Mrs. Sparks, rather than to Sparks Farm, Inc., for his efforts to incorporate the business and other legal services to the corporation. The bills, however, noted that they were with regard to Sparks Farm, Inc. At the annual shareholders' meeting on August 18, 1978, Mrs. Sparks was elected director of the corporation. At the board of directors' meeting on August 18, 1978, Mrs. Sparks was elected president and treasurer and Mr. Gifford was elected secretary of the corporation. *532 At the annual shareholders' meeting on August 17, 1979, Mrs. Sparks was elected director of the corporation. At the annual board of directors' meeting on August 17, 1979 and again on August 15, 1980, Mrs. Sparks was elected president and Mrs. Campbell was elected secretary and treasurer of the corporation. On August 17, 1979, additional shares of Sparks Farm, Inc. stock were issued as follows: Individual Receiving
Shares
Certificate #
Number of Shares
Terry Campbell
6
9
Nicole Campbell
7
9
[6] Waylon Campbell 8
9
On August 15, 1980, as will be discussed more fully below, Mrs. Campbell surrendered 1,109 shares of stock, Certificate #3, 5 and 6 were canceled, and Certificate #9 was issued to Mrs. Sparks. On September 4, 1980, the board of directors met in special session in Unionville, Missouri at the farm home where Mrs. Sparks lived, with Mrs. Sparks and Mrs. Campbell in attendance. The two discussed an earlier proposal made by Dr. Randolph R. Gillum of Dallas County, Texas to purchase 85 acres of land owned by Sparks Farm, Inc. Dr. Gillum had in earlier years offered to buy the *533 land, but Mrs. Sparks only became receptive to the offer in 1980 when she decided that she wanted the money for her daughter. A few weeks prior to the meeting, Dr. Gillum had come over to look at a tractor at the farm and repeated his earlier offers to purchase the land. On August 18, 1980, Dr. Gillum and Mrs. Sparks, as president of the corporation, executed a letter of intent for the sale of this land. At this special session on September 4, 1980, Sparks Farm, Inc. resolved to accept Dr. Gillum's offer to purchase the 85 acres of farmland. In a "Warranty Deed by Corporation," dated September 4, 1980, Sparks Farm, Inc. covenanted "that it is lawfully seized of an indefeasible estate in fee in the premises herein conveyed; that it has good right to convey the same," and "that the said premises are free and clear of any encumbrance done or suffered by it or those under whom it claims * * *." The Warranty Deed was signed by Mrs. Sparks, as president of Sparks Farm, Inc., and by Mrs. Campbell, as secretary of Sparks Farm, Inc. Mrs. Sparks also acknowledged before a notary public that the instrument was "the free act and deed of said corporation." Dr. Gillum made the check for *534 the land payable to both Sparks Farm, Inc. and the Gifford & Richardson law firm, the new name of Mr. Gifford's firm. The Warranty Deed was then filed with the Putnam County, Missouri Recorder's Office on September 18, 1980. When Mr. Gifford assisted Mrs. Sparks in the sale of the 85 acres in 1980, he learned that Mrs. Sparks had never established a separate corporate bank account. He immediately advised her to set up a separate corporate bank account for Sparks Farm, Inc. On September 5, 1980, Mrs. Sparks opened a corporate checking account at Farmers Bank of Unionville. The proceeds from the sale to Dr. Gillum were deposited in this account at that time. On September 5, 1980, checks from this new corporate account were made payable to Mrs. Campbell for $ 16,000 and to the Farmers Bank of Unionville for $ 23,413.73. Mrs. Sparks signed both of these corporate checks as "Sparks Farm, Inc./Louise Sparks, president." On the check to Mrs. Campbell, Mrs. Sparks wrote the memo "stocks" to indicate that the $ 16,000 was in exchange for the 1,109 shares of stock that Mrs. Campbell had surrendered on August 15, 1980. [7]
*535 The check from Sparks Farm, Inc.'s corporate account to Farmers Bank of Unionville in the amount of $ 23,413.73 was to repay a loan made to Mrs. Campbell and Mrs. Sparks. There is no evidence in the record to suggest that this payment of $ 23,413.73 was related to the surrender of Mrs. Campbell's shares of stock. On September 13, 1979, Mrs. Sparks and Mrs. Campbell had borrowed $ 23,153.53 from Farmers Bank of Union. These loan proceeds were used to pay off a loan of $ 22,096.37 from Production Credit Association to Mrs. Campbell and her husband, Hugh Campbell, which Mrs. Sparks had cosigned. The interest payment on the loan from Production Credit Association was $ 1,057.16. On September 13, 1979, Production Credit Association received a check in the amount of $ 23,153.53 (presumably the check from Farmers Bank of Unionville), to pay off the $ 22,096.37 principal and the $ 1,057.16 interest. On September 14, 1979, Mrs. Sparks also paid $ 1,745 to Farmers Bank of Unionville, which was applied against the principal on the new note to Farmers Bank of Unionville. This reduced the principal to $ 21,408.53. In 1980 the check from Sparks Farm, Inc.'s corporate account in the amount *536 of $ 23,413.73 paid off the principal of $ 21,408.53 and interest of $ 2,005.20. After Sparks Farm, Inc.'s checking account was opened, the account was used initially in connection with the land sale and thereafter to deposit receipts from the farm, including rent from tenants or sharecroppers, and to pay farm expenses. Checks drawn on the corporate account included checks payable for corporate taxes, to Mr. N. William Phillips for legal fees, for insurance, for storing, hauling and shelling corn, for lime, and for seed corn. Each of these checks was signed "Sparks Farm, Inc." with either "Louise Sparks" or "By Louise Sparks, president" signed below Sparks Farm, Inc. [8] On deposit slips to Sparks Farm, Inc.'s checking account, each deposit slip was made in the name of "Sparks Farm, Inc." After the audit of this case began, Mrs. Sparks changed the name of the account to "Louise Sparks Farm" account. After the sale of part of the farm to Dr. Gillum, Mrs. Sparks no longer sought or used Mr. Gifford's legal advice or services. On or about December 26, 1980, Mrs. *537 Sparks sought advice from another attorney, Mr. N. William Phillips. Mrs. Sparks sought Mr. Phillips' advice, because she was upset about and unhappy with Mr. Gifford's recommendation that she open a separate checking account for Sparks Farm, Inc. Mr. Phillips, however, advised Mrs. Sparks that she should include the farm income and expenses on the corporate income tax returns, not on her personal returns as she had been doing. Although Mrs. Sparks disagreed with this advice, she more or less followed it. In 1980 and at least the following year, Sparks Farm, Inc.'s corporate income tax returns reported income and expenses from the farm. On December 26, 1980, an additional 1,772 shares of Sparks Farm, Inc. stock (Certificate #10) were issued to Mrs. Sparks. Mrs. Sparks had this certificate canceled and reissued as follows: Individual Receiving
Shares
Certificate #
Number of Shares
Terry Campbell
11
50
Nicole Campbell
12
50
Waylon Campbell
13
50
Louise Sparks
14
1,622
On January 8, 1981, Mrs. Sparks had Certificate #14 canceled and reissued as follows: Individual Receiving
Shares
Certificate #
Number of Shares
Terry Campbell
15
50
Nicole Campbell
16
50
Waylon Campbell
17
50
Louise Sparks
18
1,472
*538 On March 1, 1983, Mrs. Campbell surrendered 100 shares, Certificate #11 and 15 were canceled, and Certificate #19 was issued to Mrs. Sparks. As of the date of trial the issued and outstanding shares of Sparks Farm, Inc. stock were held as follows: Shareholder
Number of Shares
Louise Sparks
2,682
Terry Campbell
-0-
Nicole Campbell
209
Waylon Campbell
109
3,000
In 1979, Sparks Farm, Inc. did not report any farm income or expenses on its corporate income tax return. In 1980, however, the corporate income tax return of Sparks Farm, Inc. reflected most of the income and expenses from the operation of the farm as well as the capital gain from the sale of the 85 acres of farmland to Dr. Gillum. On its 1980 corporate income tax return, Sparks Farm, Inc. reported a total of $ 13,959 in gross receipts from the farming operation and a capital gain of $ 28,300, for a total gross income of $ 42,259. In 1980, Sparks Farm, Inc. claimed a total of $ 17,022 in farm expenses. In 1981, for the first time, Sparks Farm, Inc. filed a Schedule F as part of its corporate income tax return, which included all of the farm's income and expenses for the year. In 1978 *539 and 1979, Mrs. Sparks had reported all of the income and expenses with respect to the farm on her individual income tax returns. In 1979, on Form 4835, Farm Rental Income and Expenses and Summary of Gross Income from Farming or Fishing, Mrs. Sparks reported $ 17,543 as gross farm rental income and $ 14,329 as farm rental expenses. [9] Part of the $ 14,329 of claimed farm expenses included a claimed interest expense in the amount of $ 916. In 1980, Mrs. Sparks also reported some of the farm income and expenses, in addition to those claimed on Sparks Farm, Inc.'s 1980 corporate tax return, on a Schedule F on her Federal income tax return. On that Schedule F, Mrs. Sparks claimed $ 28 as income and $ 3,562 as expenses from the farm. Part of the $ 3,562 of claimed farm expenses included a claimed interest expense in the amount of $ 2,066. On February 29, 1984, separate timely statutory notices of deficiency respecting the taxable years *540 1979 and 1980 were mailed to Sparks Farm, Inc. and to Mrs. Sparks. In Sparks Farm, Inc.'s deficiency notice, respondent made the following adjustments to income for the taxable years 1979 and 1980: 1979
1980
Rental income
$ 679.00    $ 617.00   [10]Long-term capital gain 2,469.72 1,710.00 Schedule F income
$ 17,833.89 1,273.83 Schedule F expenses
(13,472.88)
(869.54)
$ 7,509.73  $ 2,731.29 Respondent increased Sparks Farm, Inc.'s rental income by $ 679 and $ 617 for 1979 and 1980, respectively, to include the fair rental value *541 of the residence located on the farm and occupied by Mrs. Sparks. Respondent redetermined the amounts of Sparks Farm, Inc.'s Schedule F income [11] and expenses [12] and attributed this farm income and expenses to Sparks Farm, Inc. rather than to Mrs. Sparks. The amount for corporate farm expenses included a management fee in the amount of $ 1,200 in each year to compensate Mrs. Sparks for managing the farm. Respondent did not include Mrs. Sparks' claimed interest deductions of $ 916 and $ 2,066 as part of the farm's expenses in 1979 and 1980 and hence disallowed them. See n.12, supra.
*542 In the notice of deficiency addressed to Mrs. Sparks, respondent made the following adjustments to income for the taxable years 1979 and 1980: [13]
1979   1980   [14] Section 1245 property gains $ 600.00     $ 972.00    Schedule F income
(17,500.00)
(28.00)
Schedule F expenses
14,329.00 3,562.00 [15] Management fee 1,200.00 1,200.00 Constructive dividend
7,509.73 27,968.29 [16]Long-term capital gain (1,187.60)
(7,159.60)
$ 4,951.13   $ 26, 514.69 *543 Respondent adjusted Mrs. Sparks' Schedule F income and expenses, claiming that these were corporate expenses of Sparks Farm, Inc. and so were not includable on Mrs. Sparks' return. Respondent increased Mrs. Sparks' taxable income by a management fee of $ 1,200 per year for services rendered to Sparks Farm, Inc. Respondent also increased Mrs. Sparks' taxable income by constructive dividend distributions in the amounts of $ 7,509.73 in 1979 and $ 27,968.29 in 1980 from Sparks Farm, Inc. These constructive dividends represented the net income of the corporation that Mrs. Sparks had received and treated as her own income. The constructive dividend for 1980 included the $ 28,300 gains from the sale of a portion of the farmland less a net loss on the farming operations, as redetermined by respondent. OPINION The principal issue is whether the individual taxpayer, Mrs. Sparks, or the corporate taxpayer, Sparks Farm, Inc., must report the income and expenses of the farm. Respondent argues that the income and expenses of the farm, as well as the gain from the sale of 85 acres of the farm, were attributable to Sparks Farm, Inc. and should be reported on its corporate income tax *544 returns. Petitioners contend that the income and expenses of the farm, as well as the gain from the sale of the 85 acres, were properly attributable to Mrs. Sparks based on various alternative arguments: that the corporation is not a separate taxable entity, that she remained the beneficial owner of the farm after she deeded the farm to the corporation, that the corporation was her alter ego or acting as her agent, that the corporation merely held legal title as trustee under a resulting trust, that she retained a life estate in the farm, or that the corporation was not a legal corporation under Missouri law. [17]
Generally, income from property must be taxed to the taxpayer who owns the property generating the income. Helvering v. Horst,311 U.S. 112, 119 (1940); Britt v. United States,431 F.2d 227, 229 (5th Cir. 1970). As a general rule a corporation, including one wholly owned by one shareholder, is a taxpayer separate and distinct from its shareholder or shareholders. *545 New Colonial Ice Co. v. Helvering,292 U.S. 435, 442 (1934); Burnet v. Commonwealth Improvement Co.,287 U.S. 415, 419-420 (1932). The taxpayer's choice of the advantages of incorporation to do business requires acceptance of the tax disadvantages. Higgins v. Smith,308 U.S. 473, 477 (1940); Burnet v. Commonwealth Improvement Co., supra.The corporation will not be disregarded just because the owner retains direction of the corporation's affairs down to the minutest detail, provides all of its assets, and takes all of its profits. National Carbide Corp. v. Commissioner,336 U.S. 422, 433-434 (1949); Weigman v. Commissioner,47 T.C. 596, 605 (1967), affd. per curiam 400 F.2d 584 (9th Cir. 1968). Petitioners first argue that Sparks Farm, Inc. did not engage in any business activities in its own name and so is not a taxable entity. To be a separate taxable entity, the corporation must meet the alternative requirements of either business purpose or business activity. In other words, the corporation's purpose must be the equivalent of business activity or followed by the *546 carrying on of business by the corporation. Moline Properties, Inc. v. Commissioner,319 U.S. 436, 439 (1943); HospitalCorporation of America v. Commissioner,81 T.C. 520, 579-586 (1983). The test is the intended or actual business functioning of the corporation itself, rather than the taxpayer's aim to be accomplished through the corporation. Jackson v. Commissioner,233 F.2d 289, 290 (2d Cir. 1956), affg. 24 T.C. 1 (1955). In Moline Properties, Inc. v. Commissioner, supra, the corporation maintained no books or bank account and the only asset that it owned was the realty that the shareholder transferred to the corporation. The Supreme Court held that the corporation's business of defending against condemnation proceedings, instituting a suit to remove restrictions placed on property, and leasing a portion of the property was sufficient business activity and held that the corporation was a separate taxable entity. Following Moline Properties, Inc. v. Commissioner, other courts have concluded that the quantum of business activity may be rather minimal, i.e., only a small amount of activity *547 is necessary to constitute business activity. Britt v. United States, supra,431 F.2d at 235; Strong v. Commissioner,66 T.C. 12, 24 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). In Paymer v. Commissioner,150 F.2d 334, 336-337 (2d Cir. 1945), the Second Circuit held that obtaining a loan that was secured by the corporate lessor's rights, profits, and interests in a lease on the property was sufficient business activity for the corporation to be considered a taxable entity. In Harrison Property Management Co. v. United States,475 F.2d 623, 626 (Ct. Cl. 1973), cert. denied 414 U.S. 1130 (1974), the Court of Claims held that a corporation formed for the primary purpose of providing for the efficient management of the corporation should one of the stockholders die was a sufficient business purpose to constitute business activity. The corporation's other business functions included executing leases for mineral rights, hiring executive officers, paying local taxes, keeping a checking account and holding meetings of stockholders and directors. Harrison Property Management Co. v. United States, supra,475 F.2d at 626-627. *548 The courts have ignored the separate existence of corporations only in exceptional circumstances. Britt v. United States, supra,431 F.2d at 233. The income from property is taxable to the stockholders, rather than the corporation, only if the corporation is a purely passive dummy or sham or is used for a tax-avoidance purpose. Jackson v. Commissioner, supra,233 F.2d at 291; Paymer v. Commissioner, supra,150 F.2d at 337; United States v. Brager Building & Land Corporation,124 F.2d 349, 350 (4th Cir. 1941). In such cases the corporations often hold title to real estate but perform no other functions, engage in no other activities, and have no bank accounts, offices, or employees. Paymer v. Commissioner, supra;United States v. Brager Building & Land Corporation, supra,124 F.2d at 350, 352; 112 West 59th Street Corp. v. Helvering,68 F.2d 397, 399 (D.C. Cir. 1933). [18] In Strong v. Commissioner, supra,66 T.C. at 24-25, however, although the corporation was originally set up to obtain financing at a rate of interest in excess of the limit imposed *549 by state law on loans to individuals, we held that it was a taxable entity. The corporation had broad, unrestricted powers under its charter; it borrowed money on the security of rents; it mortgaged the property itself; and it received and applied the loan proceeds. 66 T.C. at 24-25. In this case petitioners must demonstrate that Sparks Farm, Inc. was not organized to conduct any business activity, i.e., was not organized for any business purpose and did not carry on any business activity. Mrs. Sparks set up a corporation so she could transfer her farm to the corporation and thereby remove the farm from the assets that *550 would be included in her gross estate upon her death. Also she wanted to be able to make lifetime gifts of shares of stock rather than having to partition the farm itself to make gifts to her daughter and grandchildren. Mrs. Sparks argues, somewhat beside the point, that she did not alter the way in which she had previously managed the farm after the incorporation. She continued to collect the rents from the tenants and sharecroppers and to deposit all of the income and pay the bills from her personal account up until the corporate bank account was set up in September, 1980. However, after the corporation was set up, Sparks Farm, Inc. proceeded to hold both annual stockholders' and board of directors' meetings. At these meetings the articles of incorporation and bylaws were adopted, the form of stock certificates was approved, and the sale of a portion of the farmland to Dr. Gillum was approved. In addition, the corporation issued stock to Mrs. Sparks' daughter and grandchildren on several occasions. These transfers implemented Mrs. Sparks' estate planning, her desire to remove the farm from the assets in her estate subject to tax upon her death and to make lifetime gifts to her *551 daughter and grandchildren. [19] In collecting the rents and paying the bills of the farm, Mrs. Sparks was acting as the sole director and president of the corporation. In other words, she was acting for and on behalf of the corporation, as is frequently the case with a solely owned or closely held corporation. Sparks Farm, Inc. also sold part of the property to which it held title. The property was deeded to Dr. Gillum by a "Warranty Deed by Corporation," which Mrs. Sparks *552 signed in her capacity as the president of Sparks Farm, Inc. Mrs. Sparks executed a letter of intent to sell, and the corporate minutes recited that she did so as president of the corporation. The corporation resolved to accept Dr. Gillum's offer and directed Mrs. Sparks to take the necessary steps to accomplish this. The warranty deed from the corporation to Dr. Gillum was filed in the Putnam County Recorder's office and was a matter of public record. In paying for the property, Dr. Gillum made the check payable to Sparks Farm, Inc. This check was then deposited in the corporate checking account that Mrs. Sparks opened on the advice of her attorney, Mr. Gifford. Mrs. Sparks chose the advantages of incorporation for estate planning purposes. She enjoyed these benefits and transferred stock to her child and grandchildren on numerous occasions. Mrs. Sparks, as well as Sparks Farm, Inc., must now accept any tax disadvantages that flow from that choice to incorporate. The intended estate planning (transfer of the farm to the corporation and the corporation's owning and operating the farm thereafter) was a valid business purpose and that purpose was the equivalent of business *553 activity under Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). Just as setting up a corporation to provide for the efficient management of a business should one of the stockholders die constituted a business purpose in Harrison Property Management Co. v. United States,475 F.2d 623 (Ct. Cl. 1973), cert. denied 414 U.S. 1130 (1974), Mrs. Sparks' estate planning purpose and the corporation's owning and operating the farm pursuant thereto constituted a business purpose and that purpose was the equivalent of business activity and resulted in actual business activity. Moreover, Sparks Farm, Inc. was not a passive dummy corporation or one created only to hold bare legal title, as petitioners now argue. Mrs. Sparks was merely unaware of how to operate the farm through the corporation and unaware of the legal implications of her decision to incorporate the farm. Although she was not happy about setting up a separate bank account for the corporation, she immediately opened such an account when Mr. Gifford advised her to do so. She did not seek tax advice after consulting with Mr. Gifford, although he had recommended that she see *554 a tax advisor. Consequently, she did not file the 1979 and earlier corporate returns properly. Instead, she improperly reported the farm income and expenses on her own personal returns. Upon being informed of these improper filings by Mr. Phillips, another attorney she consulted in late 1980, she thereafter included the farm income and expenses on the corporate returns. It is clear that Mrs. Sparks wanted the benefits of a corporation. It is unfortunate that Mr. Gifford did not fully explain or that Mrs. Sparks did not fully comprehend his explanation that a corporation is a separate legal entity, separate and distinct from the shareholder, even a sole shareholder. It is particularly regrettable that she did not follow his recommendation to seek tax advice since it was his practice never to give his clients tax advice. [20] Mrs. Sparks simply did not understand the tax consequences of the path she chose. The corporation, however, had an intended business purpose and engaged in sufficient business activities to be a separate taxable entity. [20]
*555 Petitioners next argue that Sparks Farm, Inc. should not be treated as a separate taxable entity since it was the alter ego of Mrs. Sparks. Under Missouri law [21] a court will pierce the corporate veil, or ignore a corporation's separate existence, to prevent a fraud, wrong, or injustice when imposing liability on a corporation. Central Cooling v. Dir. of Rev., State of Missouri,648 S.W.2d 546, 547 (Mo. 1982). However, in the context of taxation, the Missouri Supreme Court referred to the United States Supreme Court's decision in Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943), and held that the test is whether the arrangement between the two taxpayers is fair and lawful, and if so the separate corporate existence is observed. Central Cooling v. Dir. of Rev., State of Missouri, supra,648 S.W.2d at 548; State of Missouri v. Garrette,699 S.W.2d 468, 492 (Mo. App. 1985). *556 Sparks Farm, Inc. had sufficient business activities to constitute a separate taxable entity, and the purpose of attempting to save estate taxes was a fair and lawful purpose for creating a corporation. In addition, there is no hint of any evidence that ignoring Sparks Farm, Inc.,'s separate existence would in any way serve to prevent a fraud, wrong, or injustice. Thus, Sparks Farm, Inc. was not the alter ego of Mrs. Sparks and it had a separate corporate existence. Petitioners next contend that Sparks Farm, Inc. acted as the agent of Mrs. Sparks. If Sparks Farm, Inc. were an agent, any income or expenses of the farm would be income and expenses of Mrs. Sparks, the principal. Commissioner v. Bollinger,    U.S.   , 108 S. Ct. 1173 (1988). In determining whether an agency relationship exists between a corporation and its principal, the Supreme Court, in National Carbide Corp. v. Commissioner,336 U.S. 422, 437-438 (1949), listed six conditions or factors that must exist: (1) whether the corporation operates in the name and for the account of the principal, (2) whether the corporation binds the principal by its actions, (3) whether the corporation *557 transmits money received to the principal, (4) whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal, (5) whether the corporation's relations with its principal are dependent upon the fact that it is owned by the principal, and (6) whether its business purpose is the carrying on of the normal duties of an agent. In the recent Bollinger case, the Supreme Court upheld the six National Carbide factors, the genuineness of an agency relationship is adequately assured "when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset." Commissioner v. Bollinger, supra,108 S. Ct. at 1179. The record in this case is devoid of any indication that Sparks Farm, Inc. acted as an agent for Mrs. Sparks. The first mention of an agency relationship is in an alternative *558 argument in one of petitioner's three briefs. [22] Petitioners presented no evidence that Sparks Farm, Inc. was an agent. All documents executed by the corporation were signed in the name of Sparks Farm, Inc. by "Louise Sparks, president" and do not indicate any agency relationship existed between the corporation as agent and Mrs. Sparks as principal. Sparks Farm, Inc.'s putative role as an agent was never disclosed to anyone who dealt with the corporation, including Dr. Gillum, the purchaser of part of the land. No mention of any agency relationship was made on the recorded property deeds which specified that the owner of the land was Sparks Farm, Inc. Thus, no evidence was presented to show that Sparks Farm, Inc.'s business purpose was to act as an agent for Mrs. Sparks or that it in fact acted as an agent. Unlike the situation in Commissioner v. Bollinger, supra, there was no written agreement setting forth the terms of any agency relationship between the petitioners, Sparks Farm, Inc. was not held out as an agent, and Sparks Farm, Inc. did not function as Mrs. Sparks' agent with respect to the farm. *559 With regard to the National Carbide factors, no mention was ever made of the corporation acting in Mrs. Sparks' name. In fact, the record shows that Mrs. Sparks acted as an officer and agent of Sparks Farm, Inc., such as when she executed a letter of intent to sell the property to Dr. Gillum and when she signed the Warranty Deed by Corporation. There is no indication in the record that Sparks Farm, Inc. ever could or did bind Mrs. Sparks by its actions. Sparks Farm, Inc. did, however, transmit the money it received from Dr. Gillum and from tenants to Mrs. Sparks, but this is something that could and necessarily does occur between a shareholder and her closely held corporation. As for the fourth condition, Mrs. Sparks did initially transfer the farm to the corporation. However, once the transfer occurred, the income from the farm belonged to Sparks Farm, Inc. rather than to Mrs. Sparks. As for the requirement that the agency relationship not be dependent on the fact that the principal owns the agent, there is no evidence that it was not so dependent. While this requirement may be shown if the parties bargain at arm's length for the corporation to perform services as an *560 agent and if the corporation agent receives some type of compensation for its efforts, there is no need in this case to address the definitive meaning of this fifth National Carbide factor. [23] Petitioners presented no evidence that any type of agency agreement or arm's-length discussion of such an agreement existed or took place between Sparks Farm, Inc. and Mrs. Sparks. There is no evidence that Sparks Farm, Inc. was ever compensated for its efforts. Finally, there is no evidence that Sparks Farm, Inc. ever carried on the normal duties of an agent for Mrs. Sparks. Thus, the record overwhelmingly establishes that Sparks Farm, Inc. was not an agent for Mrs. Sparks. *561 Petitioners' next argument is that Sparks Farm, Inc. cannot be taxed as a separate entity because Sparks Farm, Inc. is not a legal corporation. Petitioners stipulated that Sparks Farm, Inc. was a corporation organized and existing under the laws of the State of Missouri. Petitioners further expressly stipulated that "Sparks Farm, Inc. was, at all times since its incorporation, a valid corporation organized and existing under the laws of the State of Missouri." Nevertheless, petitioners now argue on brief that since certain state statutory guidelines were not followed after Sparks Farm, Inc. was incorporated, it is not legally a corporation and so is not taxable. Petitioners argue that Sparks Farm, Inc. was not a legal corporation for several reasons. First, they say, Sparks Farm, Inc. issued stock before any property or services were actually received, a violation of Missouri corporation law under section 351.160. Mo. Ann. Stat. sec. 351.160 (Vernon 1965). Second, they argue, a quorum of the board of directors was never present at any of the board meetings when business was transacted. Section 351.325 states that a majority of the full board of directors *562 as prescribed in the articles of incorporation constitutes a quorum for the transaction of business unless a greater number is required by the articles. Mo. Ann. Stat. sec. 351.325 (Vernon 1949). Third, petitioners contend, notice of Sparks Farm, Inc.'s meetings was improperly given. Under section 351.235, if the meeting is convened to elect directors or take a vote of the shareholders and only if it is so provided in the bylaws, the person presiding at the meeting shall appoint no less than two persons to receive and canvass the votes given at such meeting. Mo. Ann. Stat. sec. 351.235 (Vernon 1949). With regard to petitioners' first claim, Sparks Farm, Inc. did issue a qualifying stock certificate, first to Mr. Gifford as incorporator, and then to Mrs. Sparks before Mrs. Sparks actually transferred the farm to the corporation. However, for Federal tax purposes, no stock certificates need ever be issued to a sole shareholder or to a principal shareholder of a closely held corporation. Skarda v. Commissioner,250 F.2d 429, 434-435 (10th Cir. 1957), affg. 27 T.C. 137 (1956); Inness v. Commissioner,T.C. Memo. 1968-120, *563 affd. on this issue 413 F.2d 290 (5th Cir. 1969). Assuming some problem for state purposes, the issuance of the certificate prematurely would merely void that single transfer of that share of stock and would not render the corporation void. Mo. Const. Art. XI, sec. 7 (1945); Kaiser v. Mouton,631 S.W.2d 44, 48-49 (Mo. App. 1981). Sparks Farm, Inc.'s articles of incorporation stated that two directors would make up the board of directors. Mrs. Sparks was the only director ever elected or present at the corporate meetings, so a quorum of the board of directors as prescribed in the articles of incorporation was never present at the meetings. However, the fact that a meeting has less than a quorum only means that the shareholder present cannot bind the corporation by an act or resolution unless expressly authorized. Calumet Paper Co. v. Haskell Showprinting Co.,144 Mo. 331, 45 S.W. 1115, 1116 (1898). Since Mrs. Sparks was always the controlling person here, we can assume she authorized or ratified her own actions. As for petitioners' third complaint, the bylaws of Sparks Farm, Inc. are not in evidence, and the record does not establish *564 that such bylaws provided for a special notice when electing directors. Thus there is no factual predicate to argue that Sparks Farm, Inc. needed to comply with section 351.235. These minor irregularities after incorporating appear to be rather trivial. In any event, they are at best conditions subsequent which cannot be used to challenge the fact that Sparks Farm, Inc. was a valid corporation for Federal tax purposes during the years in issue, and its corporate charter was never revoked by the State of Missouri. Moline Properties, Inc. v. Commissioner, supra.[24]
Petitioners next contend that when Mrs. Sparks deeded the farm to the corporation, she actually created a resulting trust. [25] State law determines the nature of a taxpayer's legal interest in property. United States v. Mitchell,403 U.S. 190, 197 (1971); Aquilino v. United States,363 U.S. 509, 513 (1960). The Federal tax law then determines when and how these property interests will be taxed. United States v. Mitchell, supra. *565 A resulting trust under Missouri law is one implied by law from the acts and conduct of the parties and the facts and circumstances at the time of the transaction. Meyer v. Meyer,285 S.W.2d 694, 698 (Mo. 1956); Hergenreter v. Sommers,535 S.W.2d 513, 518 (Mo. App. 1976). The general types of resulting trust include: 1) when a purchase has been made and the legal *566 estate is conveyed or transferred to one party but the purchase price is paid by another party; 2) when a person standing in a fiduciary relation uses fiduciary funds or assets to purchase property in his own or a third person's name; 3) when property is transferred without any consideration coming from the donee or grantee under such circumstances that he is considered as holding the property for the benefit of the donor or grantor; 4) when property is acquired by a person under circumstances that show that it is conveyed to him on the faith of his intention to hold it for or convey it to another, or to hold it for or convey it to the grantor or the grantor and another; and 5) the trust that arises in favor of the donor, or those claiming under him, when the trust is not fully declared, or fails, in whole or in part. Little v. Mettee,93 S.W.2d 1000, 1010 (Mo. 1936). In a resulting trust, the legal owner holds the property for the beneficial owner but cannot properly exercise any control or dominion over the property in his own right. Shelley v. Landry,79 A.2d 626, 628-629 (N.H. 1951); Collins v. Link,562 S.W.2d 131 (Mo. App. 1978). *567 The intention to create a resulting trust is the essential element, although the intention is not expressed by words of direct creation or an agreement. Meyer v. Meyer, supra;Fulton v. Fulton, 528 S.W.2d at 154. The evidence indicating a resulting trust must be so clear, unequivocal, and convincing that the court has no reasonable doubt as to the existence of such a trust. Long v. Kyte,340 S.W.2d 623, 627 (Mo. 1960); Meyer v. Meyer, supra,285 S.W.2d at 699; Little v. Mettee, supra,93 S.W.2d at 1005; Woodworth v. Mauk,614 S.W.2d 308, 311 (Mo. App. 1981). This is especially true when only parol evidence is offered to prove a resulting trust. Warford v. Smoot,237 S.W.2d 184, 186 (Mo. 1951). The burden of proof is on the party attempting to establish the trust. Woodworth v. Mauk, supra.
In this case there are no acts and conduct of the parties or facts and circumstances at the time of the transfer from which this Court could or would imply a resulting trust. When Mrs. Sparks transferred the far to the corporation, she gave no indication that she *568 intended the corporation merely to hold legal title rather than to own the property. Mrs. Sparks had a definite reason for incorporating Sparks Farm, Inc. and transferring the farm to the corporation. She wanted to remove the farm from her estate to reduce the assets in her estate for estate tax purposes. She had discussed this purpose with her attorney on several occasions. To achieve this purpose Mrs. Sparks conveyed the farm to Sparks Farm, Inc. without retaining any beneficial ownership in the farm. The General Warranty Deed specified that Mrs. Sparks conveyed all of her rights and privileges in the land to the corporation. The fact that the land was now owned in fee simple by the corporation was recorded in the land records of Putnam County, Missouri. In the sale to Dr. Gillum the transfer was made by "Warranty Deed by Corporation" in which Sparks Farm, Inc. convenanted as to the indefeasible estate in fee it was conveying to Dr. Gillum. There is no basis in this record for implying a resulting trust. Petitioners invoke that equitable remedy as a mere afterthought to try to change the tax consequences of the course of action Mrs. Sparks chose to follow. Tax consequences *569 depend upon what was in fact done, not that might have been done. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 148 (1974). The only evidence petitioners presented to try to show that Sparks Farm, Inc. held the farm in a resulting trust was Mrs. Sparks' self-serving and confusing testimony that she did not believe that she would have to alter the way in which she had previously conducted the farm business after she deeded the farm to the corporation. However, Mrs. Sparks was confused about the law and simply wanted conflicting and inconsistent goals. See n.20, supra. Mrs. Sparks' purpose for incorporating, to remove the farm from her estate, could not have been achieved if Sparks Farm, Inc. held the farm in a resulting trust for her as the beneficial owner. Under section 2037(a) the gross estate includes any interest in property if possession and ownership can be obtained only by surviving the decedent and the property may return tot he estate or be subject to the decedent's disposition. Although Mrs. Sparks may have mistakenly believed, or wistfully hoped, that she could accomplish her purposes and still retain ownership of the *570 farm, her acts and conduct show that she intended to transfer the farm to Sparks Farm, Inc. without retaining any type of beneficial ownership and did so. On this record, we are satisfied that Sparks Farm, Inc. was both the legal and beneficial owner of the far, that no resulting trust can be implied here, and that Sparks Farm, Inc. is a separate taxable entity. Petitioners next argue that, if Sparks Farm, Inc. is found to be a taxable entity, Mrs. Sparks need not pay taxes on constructive dividends from Sparks Farm, Inc., because she retained a life estate when she transferred the farm to the corporation. Petitioners contend that Mrs. Sparks received income from the farm because of this retained interest rather than because of her stock ownership in Sparks Farm, Inc. In Missouri, in order to retain a life estate in property, the creator need not use the words "life estate" but must express the intention to retain a life estate with any appropriate, equivalent words. Cross v. Hock,149 Mo. 325, 50 S.W. 786, 790-791 (1899). Otherwise, an estate in fee is assumed. In this case no express or equivalent words were used to indicate Mrs. Sparks' intention to retain *571 a life estate. When Mrs. Sparks conveyed the farm to the corporation, the General Warranty Deed stated that the farm was conveyed to Sparks Farm, Inc.'s heirs and assigns, "FOREVER * * *." We find that there simply is no evidence of any retained life estate. The fact that Mrs. Sparks received all of the net income of the corporation does not indicate that she retained a life estate when she transferred the farm to Sparks Farm, Inc. Moreover, Mrs. Sparks would be taxable on the income either way, whether she received the corporation's net income as a result of a life estate or as constructive dividends from here closely held corporation. Probably petitioners are here arguing that only Mrs. Sparks and not both are taxable on the income. However, it seems to be just another variation on petitioners' theme that the corporation is not a separate taxable entity or that the corporation did not earn the income from the farm. Having concluded that Sparks Farm, Inc. is a separate taxable entity, that the corporation owned the farm and earned the rental income from the farming operations and from the sale of some of the land, and that Mrs. Sparks did not have a retained life estate in the *572 farm, the corporation is taxable on its income, with certain adjustments. Also Mrs. Sparks is taxable on certain distributions of corporate earnings that she received as constructive dividends, again with certain adjustments to be discussed below. In this case Mrs. Sparks was the manager of the farm during the years in issue. Her duties as manager included collecting rent from the pasture land twice a year, collecting the corporation's share of the crop income once a year, and paying a few bills. Since Sparks Farm, Inc. did not compensate Mrs. Sparks for these services, under section 482 respondent allocated an annual management fee of $ 1,200 to Mrs. Sparks for 1979 and 1980, and allowed corresponding deductions for those years to Sparks Farm, Inc. Petitioners now claim a management fee in excess of $ 1,200 for both 1979 and 1980 as well as ten percent of the $ 40,000 sales price for the land sold to Dr. Gillum as compensation for Mrs. Sparks' efforts in the sale of the property. Since Mrs. Sparks did not actually receive $ 1,200 or any other amount of fees or commissions from the corporation except what she received as constructive dividends, we assume petitioners are not *573 trying to increase her income but are trying to say that part of the constructive dividends were really fees or commissions and hence deductible by Sparks Farm, Inc. The only argument petitioners made to substantiate their claim that Mrs. Sparks should receive more than $ 1,200 per year as a management fee was that it was "a reasonable assumption" that she did more than collect rent and crop income and pay bills. However, there is no evidence that she did anything more, and her duties were rather minimal. Mrs. Sparks did not know what other farm managers in the area charged to manage farms. More importantly, the record does not show what duties other farm managers in the area performed. Nonetheless, she testified that she would charge ten percent of the farm's net income as her management fee. Under that theory Mrs. Sparks would receive far less than $ 1,200 per year. [26] While we think it is rather generous, we sustain respondent's determination that Mrs. Sparks is entitled to a management fee of $ 1,200 per year and Sparks Farm, Inc. is entitled to deduct this amount on its corporate returns. *574 With regard to the compensation for Mrs. Sparks' efforts in selling the property to Dr. Gillum, the only evidence of Mrs. Sparks' "efforts" was her testimony that Dr. Gillum had spoken to her two or three years earlier, indicating his interest in the land. Shortly before the sale, Dr. Gillum came over to the farm to look at a tractor and at that time renewed his offer, whereupon Mrs. Sparks agreed to sell the land, since her daughter needed money. This discussion took place a few weeks before the actual sale on September 5, 1980. There is no evidence that Mrs. Sparks did anything further to aid in the sale, that the corporation agreed to pay a ten percent fee or any other amount to Mrs. Sparks for the sale of land, that Mrs. Sparks actually incurred any out-of-pocket expenses with regard to the sale, or that she as the farm manager did anything other than report Dr. Gillum's offer to the corporation. Even as president of the f, she only signed a letter of intent, attended the stockholders' meeting approving the sale, and signed the Warranty Deed by Corporation. Petitioners bear the burden of proof. Rule 142(a). Petitioners' evidence of a casual conversation with Dr. Gillum *575 prior to the sale of the land does not justify the ten percent commission petitioners now argue that Mrs. Sparks is entitled to. We conclude that the $ 1,200 management fee adequately compensated her for all of her duties as farm manager and for whatever she did in regard to the sale to Dr. Gillum, either as farm manager or as corporate president. The next issue is whether Sparks Farm, Inc.'s taxable income should be increased under section 482 by $ 679 in 1979 and $ 617 in 1980 to include the fair rental value of the residence on the farm that Mrs. Sparks occupied. Petitioners argue that no allocation of the fair rental value of the residence should be made to Sparks Farm, Inc. based on either the argument that Mrs. Sparks resided on the farm for the benefit of Sparks Farm, Inc. or that she retained a life estate in the farm when she transferred the farm to Sparks Farm, Inc. We have already rejected the life estate argument, so we will only address the first. We note that respondent has not allocated or imputed income of $ 679 and $ 617 to Mrs. Sparks for the years 1979 and 1980, respectively, for her continued occupancy and use of the farm residence. We also note that the *576 corporation has not in fact received any such rental income from Mrs. Sparks. Petitioners argue that no allocation is necessary since the entire record demonstrates that Mrs. Sparks was required to reside at the farm for the benefit of Sparks Farm, Inc. as a condition of her employment. The evidence in the record on this matter is scant, consisting of Mrs. Sparks' testimony that it was easier for her to collect the pasture rent twice a year and the farm crop income once a year by living on the farm. The Court found this testimony unpersuasive. There is simply no evidence that her residing on the farm was a condition of her employment as the farm manager. She had long lived on that farm that she had inherited from her late husband, and she continued to live there up to the time of the trial. Under section 119(a)(2) the value of a lodging furnished to an employee is excluded from the employee's gross income if "the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." Here, however, the fair rental value of that lodging has not been included in Mrs. Sparks' income by respondent, and section 119 does not apply to her. *577 Moreover, that section offers no relief to the corporation for its imputed rental income. Other than an Argument VI heading in his reply brief, reading "Louise Sparks has taxable income in 1979 and 1980 of $ 679.00 and $ 617.00, respectively, for the fair rental value of the farm house," which heading is repeated at page 58 of the reply brief but without any text thereto, respondent has never allocated nor attempted to impute any income to Mrs. Sparks for the farm house. The fair rental value of the farm house owned by the corporation but occupied by Mrs. Sparks could well constitute additional constructive dividend income to her. However, the issue was not raised in the deficiency notice, and respondent has never sought, and we will not now consider, any increased deficiency in that regard. We are disturbed, however, that the corporation is being charged for rental income it did not receive. This is not a proper allocation of items of income and expense between related taxable entities, as permitted by section 482, but an unwarranted attempt to create taxable income out of nothing. We conclude that the corporation's income should not be increased by these amounts of nonexistent *578 rental income. The next issue is whether Mrs. Sparks is entitled to interest deductions in 1979 and 1980 under section 163 with respect to her payments of interest in connection with a loan she cosigned for Mr. and Mrs. Campbell and another loan that she and Mrs. Campbell obtained. In 1979 Mrs. Sparks and Mrs. Campbell borrowed $ 23,153.53 from Farmers Bank of Unionville. The proceeds of this loan were used to pay off a loan of $ 22,096.37 from Production Credit Association to Mrs. Campbell and her husband, Hugh Campbell, which Mrs. Sparks had cosigned. The interest that was paid off was $ 1,057.16. The loan from Farmers Bank of Unionville was repaid in 1980 with part of the proceeds from the sale to Dr. Gillum. The interest paid in 1980 on this second loan was $ 2,005.20. Respondent contends that Mrs. Sparks may not claim these expenses as interest deductions on her Federal income tax returns because there is no evidence that she actually paid the interest or whether she intended to make a gift to Mrs. Campbell by paying off the loan to Farmers Bank of Unionville. Petitioners argue that since Mrs. Sparks cosingned the note with Mr. and Mrs. Campbell and later obtained another *579 loan with Mrs. Campbell, she is entitled to interest deductions for the amount of interest she actually paid. Petitioners also contend that since respondent treated the $ 23,413.73 from the sale to Dr. Gillum, which was used to pay the loan from Farmers Bank of Unionville, as a distribution (constructive dividends) to Mrs. Sparks, respondent cannot argue that a cannot claim these payments as interest deductions on her Federal income tax return. We agree with petitioners. Mrs. Sparks was at least a cosigner if not the primary obligor on the two loans. Any cosigner who pays the interest on a note is entitled to an interest deduction for the amount she paid. Larson v. Commissioner,44 B.T.A. 1094, 1104 (1941), affd. 131 F.2d 85 (9th Cir. 1942). This is true even if the cosigner later makes a gift of the amount to the other cosigner. Larson v. Commissioner, supra.Accordingly, Mrs. Sparks is entitled to interest deductions of $ 1,057.16 and $ 2,005.20 in the years 1979 and 1980, respectively. There seems to be no question that Mrs. Sparks received much of the net income of the corporation and regarded it as her own income. Probably *580 because of the multitude of other issues and arguments addressed by the parties, surprisingly little heed has been paid to the constructive dividend issue. Both petitioners and respondent seemed to assume that issue more or less took care of itself, and perhaps to some extent it does. A dividend, of course, need not be formally declared by a corporation. Petitioners seem to agree that if the corporation was a separate taxable entity, if the corporation itself owned the farm and earned the rental income from the farm operations and the capital gain income from the sale of a portion of the land, and if Mrs. Sparks did not retain a life estate in the farm, as we have now so held, then the corporation would be taxable on its income (with adjustments discussed above) and Mrs. Sparks would be taxable on distributions she received from the corporation as constructive dividends. However, neither party discussed how much Mrs. Sparks actually received, particularly as to the proceeds from the sale of the land. Two checks were written on the corporate account, dispensing those sales proceeds. As president of the corporation, Mrs. Sparks signed a corporate check for $ 16,000 to Mrs. Campbell *581 and a corporate check for $ 23,413.73 to Farmers Bank of Unionville. Since the $ 23,413.73 check was used by Mrs. Sparks to pay off a loan on which she was personally liable, that amount constituted a constructive dividend to her. However, the Court does not accept respondent's characterization of the facts in regard to the $ 16,000 check to the daughter. See n.7, supra.
Respondent views the facts as if Mrs. Sparks personally purchased her daughter's 1,109 shares of stock, and hence the $ 16,000 check constituted a constructive dividend to Mrs. Sparks. Very likely Mrs. Sparks herself, who had trouble grasping the whole idea of the corporation as a separate legal entity, may have subjectively viewed the transaction in that same manner. Mrs. Sparks testified she would have given her daughter the $ 16,000 even if the daughter had not surrendered her shares of stock because her daughter needed the money. Nevertheless, the Court concludes that, in substance and in form, the corporation redeemed its shares from the daughter. Under section 317(b) stock is treated as "redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether *582 or not the stock so acquired is canceled, retired, or held as treasury stock." In this case Mrs. Campbell transferred her entire interest in corporation of 1,109 shares of stock to the corporation on August 15, 1980. These shares were then canceled. Three days later Mrs. Sparks as president of Sparks Farm, Inc. executed a letter of intent with Dr. Gillum to sell 85 acres of the land for $ 40,000. The sale was consummated on September 5, 1980, and we have concluded that these various steps were all part and parcel of a single transaction. Mrs. Campbell then received $ 16,000 of the $ 40,000 in exchange for the 1,109 shares of stock that she had surrendered to the corporation. The corporate check in the amount of $ 16,000 payable to Mrs. Campbell was signed by Louise Sparks as president of Sparks Farm, Inc., and the memo on the check noted it was for stock. The transaction properly viewed as a whole shows that the corporation redeemed Mrs. Campbell's stock. Thus, we conclude that Mrs. Sparks did not personally receive, directly or indirectly, the $ 16,000 and the $ 16,000 did not constitute a constructive dividend to her. [27]
*583 To reflect the concessions and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Although Sparks Farm, Inc. and Louise Sparks were issued separate notices of deficiency by respondent, due to the fact that each petitioner's tax liability arose out of the same transaction, petitioners were permitted to file a single petition pursuant to Rule 61(a) of the Tax Court Rules of Practice and Procedure.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Although the parties' first stipulation states that only lime was provided by the landlord to the tenants, in the notice of deficiency respondent determined that Sparks Farm, Inc. was entitled to deduct other farm expenses including fertilizer, seed, machine hire, breeding fees and repairs. This suggest that the landlord provided items other than lime. However, the record is clear that the landlord did not furnish machinery and equipment, and any such machinery and equipment on Sparks Farm was not used in the farming operation after Mr. Sparks' death but was sold off by Mrs. Sparks over a period of years. ↩
4. Mr. Gifford surmised at trial that he might also have suggested a trust to Mrs. Sparks. Mrs. Sparks could not remember any discussion of trusts, and Mr. Gifford could not be sure that he discussed trusts with her. ↩
5. The court found Mrs. Sparks' testimony to be somewhat illogical and confusing. While the Court does not question her veracity as such, the Court noted a tendency on her part to say whatever she thought the questioner wanted to hear or whatever she thought might be helpful to her case, coupled with a woeful inability to comprehend either one. ↩
6. Mrs. Campbell gave birth to Waylon Campbell in 1978.↩
7. Mrs. Sparks, ever the good mother, testified that she would have given her daughter the $ 16,000 even if the daughter had not surrendered her shares since the daughter needed the money. Although at the time of the transfer of the $ 16,000, Mrs. Campbell was technically no longer a stockholder in Sparks Farm, Inc., having recently surrendered the shares, nonetheless it is clear that the surrender of the shares on August 15, 1980, the signing of the letter of intent with Dr. Gillum on August 18, 1980, and final sale of the land distribution of the proceeds on September 5, 1980 were all part and parcel of a single transaction, and we so find. Respondent requested the Court to find as a fact that "Louise Sparks personally purchased the 1,109 shares of stock from her daughter Terry Campbell for $ 16,000.00," and petitioners interposed no objection to that requested finding. However, for reasons discussed more fully in the opinion below, we conclude that Sparks Farm, Inc. redeemed Mrs. Campbell's 1,109 shares of stock for $ 16,000. ↩
8. Only one of the checks on the corporate account, the one to Dale Ream for tax services, was simply signed "Louise Sparks." ↩
9. Louise Sparks also filed a Form 4835 for farm rental expenses and income with regard to her land in Texas. However, this land was never deeded to Sparks Farm, Inc. and so was properly included on Mrs. Sparks' individual income tax return. ↩
10. Respondent increased Sparks Farm, Inc.'s income for long-term capital gains in both years for the sale of timber. Mrs. Sparks had included the sale of timber from the farm in the amount of $ 2,469 on her 1979 Federal income tax return. There is no indication that the 1980 sale of timber was reported on either the individual or the corporate return. The only argument petitioners made as to why Sparks Farm, Inc.'s income should not be increased by this gain was that Mrs. Sparks, rather than the corporation, owned the land and so she is entitled to the income from the sale of the timber.↩
11. The record does not explain the discrepancy of $ 290.89 between the amount Mrs. Sparks reported as income from the farm on her Federal income tax return in 1979 ($ 17,543) and the amount respondent included in Sparks Farm, Inc.'s income as farm income for 1979 ($ 17,833.89). ↩
12. Respondent determined the amount for expenses in the taxable years 1979 and 1980 as follows: ↩
1979 1980   Labor
$ 6.00     $ -0-      Repairs
403.35
102.00
Seed
752.00
812.00
Fertilizer
4,743.00
5,480.00
Machine Hire
2,725.00
2,141.83
Breeding Fees
10.00
-0-  Storage
251.00
331.00
Taxes
1,028.00
1,046.00
Insurance
856.00
796.00
Freight
238.00
211.00
Conservation
-0- 3,233.21
Other-Sprays
-0- 569.00
Miscellaneous        47.62
-0-  Legal Fees        -0- 854.00
Auto        590.91
410.50
Fire Dues        -0- 25.00
Management Fees        1,200.00
1,200.00
Utilities
132.00
190.00
Depreciation
490.00
490.00
Total Allowable
$ 13,472.88
$ 17,891.54
Claimed on Return
-0-  17,022.00
Decrease to Income
$ 13,472.88
$ 869.54   13. Respondent also determined that Mrs. Sparks was subject to an investment credit recapture in 1979 on a rake she disposed of in the amount of $ 175 instead of the $ 117 she reported on her return. Petitioners did not address this issue at trial and conceded the issue in the first of their three briefs. Petitioners have either abandoned this issue or have failed to carry their burden of proof. Rules 142(a), 149(b). ↩
14. Petitioners did not discuss this adjustment at trial and conceded it in their first brief. Again petitioners have either abandoned this issue or have failed to carry their burden of proof. Rules 142(a), 149(b). ↩
15. Respondent also determined that Mrs. Sparks was liable for self-employment tax of $ 97.20 each year in regard to this management fee. ↩
16. This reduction in Mrs. Sparks' long-term capital gain was for the sale of timber in 1979 that was reportable by the corporation rather than by the individual taxpayer, and an involuntary conversion in 1980 that respondent determined was actually taxable in 1978. Petitioners' sole argument as to why the timber gain should be included in Mrs. Sparks, rather than Sparks Farm, Inc.'s income tax return, is that Mrs. Sparks should be able to include income and expenses of the farm. The involuntary conversion adjustment is in Mrs. Sparks' favor and she does not challenge it.↩
17. Since these arguments are inconsistent with the reporting positions taken on their 1980 tax returns, each petitioner also claims an overpayment of taxes that year. ↩
18. See Czvizler v. Commissioner,↩ a Memorandum Opinion of this Court dated Apr. 9, 1953. In that case we determined that a corporation was not a taxable entity since the corporation's only business activity was holding a special meeting of the board of directors in which the taxpayer was elected one of the directors and president. The taxpayer had used his personal bank account to deposit all receipts and payments of expenses, and paid out all unemployment compensation, withholding, and social security reports from his personal account. 19. If Sparks Farm, Inc. held only bare legal title, as petitioners now argue, Mrs. Sparks' estate tax planning would have been in vain. Under section 2037(a), the gross estate includes the value of property to the extent that the possession or enjoyment of the property can only be obtained by surviving the decedent and to the extent that the decedent had a reversionary interest, such that the property may be subject to a power of disposition by the decedent, that exceeds five percent of the value of the property. If the corporation held only bar legal title, then the farm would be subject to a power of disposition by Mrs. Sparks and would be includable in her gross estate for estate tax purposes. ↩
20. Mrs. Sparks' conceptual difficulties spring from the fact that she wanted conflicting and inconsistent things. She wanted to transfer the farm to a corporation to get it out of her estate and save estate taxes, yet at the same time, she wanted to retain the farm until her death. She wanted to be able to make lifetime gifts of shares of stock to her daughter and grandchildren and avoid the problem of dividing up the farmland and recording deeds conveying portions of the land to them, yet at the same time she wanted any lifetime gifts not to take effect until her death. A proper tax advisor should have been able to explain both the benefits and the burdens of various courses of action and to help her choose from among her competing and conflicting goals. It is regrettable that Mrs. Sparks narrowly focused on possible estate taxes in the indefinite future and apparently did not consider income taxes in the here and now. However, this Court must deal with what she in fact did and not with what she might have done had she sought tax advice. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 148↩ (1974). 21. Whether to apply the State or Federal alter ego doctrine depends on the degree to which the subject matter of the case involves Federal interests. Wolfe v. United States, 798 F.2d determination of whether there exists an alter ego from whom the government may satisfy the obligation of a taxpayer. Wolfe v. United States, supra. As the Wolfe↩ case itself shows, a corporation can be a separate taxable entity for purposes of assessing a corporate tax and yet have that corporate veil pierced under the alter ego doctrine so that the tax can be collected from the individual shareholder. Thus, the alter ego doctrine is of little assistance in the present case, where Mrs. Sparks is trying to avoid any tax on the corporation. 22. However, in petitioner' argument that Sparks Farm, Inc. only held bare legal title, their brief states that Sparks Farm, Inc. "did not conduct any other activities incident to the carrying on of a business in any capacity whatsoever, in its own name, as either principal or agent." ↩
23. This issue has frequently been stated in terms of whether or not the fifth National Carbide factor is mandatory. See Ourisman v. Commissioner,760 F.2d 541, 547-548 (1985), revg. 82 T.C. 171 (1984). In Commissioner v. Bollinger,    U.S.   , 108 S. Ct. 1173 (1988), the Supreme Court appeared to undercut the overly strict approach taken by some of the circuits, stating: We think the fifth National Carbide factor -- so much more abstract than the others -- was no more and no less than a generalized statement of the concern, expressed earlier in our own discussion, that the separate-entity doctrine of Moline not be subverted. [108 S. Ct. at 1179.]
However, the present case does not require us to revisit our Ourisman↩ opinion at this time. 24. For a discussion of such conditions subsequent, see Whitaker v. Commissioner,T.C. Memo. 1988-418↩. 25. Petitioners also argue that when Mrs. Sparks transferred the farm to Sparks Farm, Inc., she created a "revocable resulting trust." A resulting trust exists as an equitable remedy when one party has legal title to the property and it is clear that another party holds the beneficial interest or ownership. Through a resulting trust the court can return legal ownership to the beneficial owner. A court creates a resulting trust because the beneficial owner cannot revoke the legal owner's ownership without the court's help. If the trust were revocable, there would be no need for a court to step in and create a resulting trust. However, this argument appears to be another variant of the argument that Sparks Farm, Inc. held bare legal title to the farm, an argument rejected above. ↩
26. At trial when questioning Mrs. Sparks about a management fee, petitioners' counsel through leading questions tried to get Mrs. Sparks to state that a proper management fee would be ten percent of the farm's gross income. However, Mrs. Sparks clearly stated that if asked to manage a farm she would ask for a fee of ten percent of the farm's net income. If Mrs. Sparks were to receive ten percent of the farm's net income, based on corporation's income as adjusted in the notice of deficiency, she would receive ten percent of $ 4,361.01 ( $ 17,833.89 in income - $ 13,472.88 in expenses) or $ 436.10 in 1979. In 1980, since the corporation had no net income ( $ 15,232.83 in income - $ 17,891.54 in expenses from farming, Mrs. Sparks would be entitled to zero. ↩
27. Mrs. Campbell is not a party before the Court. Therefore, the determination of the tax consequences to Mrs. Campbell as a result of the redemption is not before us. See Rule 13(a). While it may be that Mrs. Campbell would not qualify for sale of exchange (capital gains) treatment on the redemption due to the attribution rules, and therefore would be treated as receiving ordinary income on the redemption, we do not address that issue. See secs. 302(a)-(d). We hold only that there was no distribution of $ 16,000 to Mrs. Sparks. ↩