LAWRENCE S. CHARFOOS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Charfoos v. Commissioner
Docket No. 14056-88
United States Tax Court
T.C. Memo 1991-292; 1991 Tax Ct. Memo LEXIS 338; 62 T.C.M. (CCH) 32; T.C.M. (RIA) 91292; July 2, 1991, Filed *338 Decision will be entered for the respondent. John B. Curcio, for the petitioner. Margaret A. Satko and Eric M. Nemeth, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice of deficiency, dated March 22, 1988, respondent determined deficiencies in, and additions to, petitioner's Federal income tax as follows: Additions to Tax
Taxable
Section
Section
Section
Section
Year
Deficiency
6653(a) [1]
6653(a)(1)
6653(a)(2)
6661
1980
$ 95,792.00
$ 4,789.60
--
--
--
1981
$ 70,555.45
--
$ 3,527.77 *
--
1982
$ 52,844.43
--
$ 2,642.22 **
$ 13,211.11
The issues for decision are: (1) Whether operating losses generated *339 by petitioner's yacht-chartering activity are attributable to petitioner as an individual or to a separately taxable corporation that petitioner organized; (2) if the losses are attributable to petitioner as an individual, whether he is entitled to deduct them from his gross income because he engaged in the chartering activity with an actual and honest profit objective as required by section 183; (3) assuming the losses are attributable to petitioner and petitioner engaged in the yacht-chartering activity with the requisite profit objective, whether respondent nonetheless properly disallowed certain Schedule C deductions because petitioner failed to properly establish his entitlement to them; (4) whether petitioner accurately reported income and a depletion expense from a drilling partnership on his 1981 tax return; (5) whether petitioner was entitled to an $ 8,562 casualty loss deduction on his 1981 tax return; and (6) whether petitioner is liable for the additions to tax determined by respondent for negligence and for the substantial understatement of income tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached *340 exhibits are incorporated herein by this reference. Lawrence S. Charfoos, hereinafter petitioner, was residing in Detroit, Michigan, when the petition in this case was filed. Petitioner is a prominent trial attorney who has handled large, technically complex personal injury and products liability cases. He has also published three books, two of which are law textbooks. During the years in issue, petitioner was a partner in the Detroit law firm of Charfoos & Charfoos. Petitioner first became interested in the yacht-chartering business in June 1979 when he and three friends chartered a 79-foot motor yacht, named Colinga, for a 2-week vacation cruise on the French Riviera. The Colinga was built in England in 1969 and, at the time of petitioner's cruise, had two double cabins, two single cabins, adjoining bathrooms, separate crew quarters, spacious living room, dining room, modern galley, air conditioning, after deck, flying bridge, sunbathing area, and many modern conveniences. In 1979, the Colinga had been used as a charter yacht only occasionally by her owners. The Colinga's first owner, an elderly Englishman named Evelyn Jones, used the yacht with his family for recreational *341 purposes until 1975, when he decided to renovate her for possible use as a charter yacht in the Mediterranean yacht charter market. He hired Barry Piggin, an experienced English seaman and personal friend, to be the Colinga's skipper and to begin the repairs and renovations. In 1976, Mr. Jones chartered the Colinga to several parties for overnight trips, even though the planned repairs had not yet been completed. Captain Piggin's wife, Heather, worked as the Colinga's cook during these chartered trips. In 1977, before the Colinga's renovations were completed, Mr. Jones sold her to Hroar Hansen, a Norwegian citizen. Although Mr. Hansen chartered the Colinga to paying guests a few times in 1977 and 1978, he and his family used the yacht primarily for their own recreation. Mr. Hansen retained Captain Piggin as the Colinga's skipper, and Heather Piggin as the yacht's cook and bookkeeper. Captain and Heather Piggin thought that the interior of the yacht was becoming shabby and that a lot of money needed to be spent in order to properly maintain the Colinga's hull, engine, and mechanical parts. The Piggins tried to convince Mr. Hansen to complete the renovations that the first owner *342 had begun. However, in the fall of 1978, Mr. Hansen suffered some large, unrelated business losses, and became financially unable to pay the Piggins' salaries or any of the bills that the boat incurred, or to complete the repairs that Captain Piggin felt were necessary to make the Colinga competitive in the Mediterranean charter market. Captain and Heather Piggin began to pay the Colinga's operating expenses and invested their own money to complete the mechanical repairs Captain Piggin felt were essential. The Piggins believed they could recoup their investment in the approaching Mediterranean charter season which runs from May through October. The Piggins also began to keep an eye out for a prospective buyer with enough money and the desire to complete other mechanical repairs, as well as renovations to the Colinga's interior that the Piggins felt were much needed. Petitioner and his three friends were one of the first groups to charter the Colinga in 1979. During their cruise, petitioner began talking with Captain and Heather Piggin about the business of yacht chartering in general. Captain Piggin told petitioner that the Colinga could probably be purchased at a very low *343 price due to the financial position of Mr. Hansen. In the 1960's petitioner and a friend had co-owned a 35-foot cabin cruiser which they used for recreational purposes in Detroit. Petitioner has also previously owned several small speed boats and chartered a yacht for a Caribbean vacation. However, before 1979, petitioner had never owned a large yacht nor operated any form of yacht-chartering business. The opportunity to buy the Colinga at a low price and obtain what petitioner believed to be an ongoing charter business, piqued his interest. Petitioner was also very impressed by the Piggins' yachting experience, as well as their reputation and demeanor as professional crew members. During the cruise, petitioner's discussions with the Piggins became focused on the Colinga's average operating expenses and charter revenues, marketing ideas, and the specific repairs and renovations that the Piggins felt were necessary. During one of these discussions, petitioner jotted down four pages of notes summarizing the Piggins' estimates of the Colinga's yearly operating expenses. The Piggins based their estimates of expenses on their general familiarity with the operation of the Colinga; *344 the yacht's operating expenses and repairs which they had paid out of their own pockets when Mr. Hansen began having financial difficulties in the fall of 1978; and on the yacht's bank statements, bank journal, and petty cash book, all of which were kept on board by Heather Piggin. Petitioner was allowed to view these records during their discussions. Petitioner's informal, four-page estimate included some of the larger fixed costs associated with operating a charter business such as water, electricity, moorage, chandlery, daily maintenance, and the crew's salaries, uniforms, and food. Petitioner determined that he could offset these expenses if he had at least 8 weeks of yacht rentals each charter season. Petitioner was aware that in order to adapt the Colinga for continuous charter service, a number of expensive improvements would be required, including the overhaul of the engines and the replacement of the anchor, air conditioning system, and speed boat. However, petitioner did not take the cost of these needed improvements into account when initially estimating his expenses. Nor did he consider the full cost of maintenance, insurance, interest on a mortgage loan, his air *345 travel, and the potential of fluctuations in the foreign currency exchange rates. By the end of his 2-week vacation cruise, petitioner decided that, if he could negotiate a low price, he would like to purchase the Colinga and utilize her as a Mediterranean charter yacht. He also told the Piggins that he wanted to hire them as the Colinga's crew, pursuant to a 5-year employment contract. In July 1979, after petitioner had returned to the United States, but prior to his purchase of the Colinga, Captain Piggin sent him a detailed, typewritten estimate of the all expenditures needed to upgrade and restore the yacht. The estimate was broken down in terms of "winter" and "summer" running expenses and "necessary" and "suggested" improvements. The estimates were in French currency and were not converted to dollar figures. Petitioner did not verify or investigate the estimates made by Captain Piggin and Heather. However, petitioner felt that he could rely on the accuracy of the Piggins' estimates for expenses and improvements because of their expertise with yachts, the fact that they shopped for many of the spare parts and refurbishings themselves, and because Captain Piggin performed *346 many of the Colinga's repairs. In negotiating the purchase price of the Colinga, petitioner consulted Yachting Partners International Ltd. (hereinafter Yachting Partners), an international yacht charter and brokerage firm based in Sussex, England. The seller, Mr. Hansen, had used Yachting Partners in booking charters for the Colinga. The principal of Yachting Partners, Alex Braden, was a good friend of Captain Piggin. On August 10, 1979, Yachting Partners sent petitioner a letter advising him that the Colinga's records for the 1978-79 season would not be of "great assistance" to him in estimating operating expenses because they showed an unrealistically low picture. According to the letter, the original purchase survey, slipping, and work expenses were not included in the 1978-79 records. Furthermore, all other expenses, such as the replacement of the radar, winter slipping, and various repairs, were carried forward to the following season. Thus, the 1978-79 records only showed income and a few of the day-to-day expenses. Prior to his purchase of the Colinga, petitioner did not obtain a written appraisal of the fair market value of the yacht or an independent market study *347 of the profit potential of the Mediterranean yacht-chartering business. On September 24, 1979, petitioner executed a sales contract in which he agreed to buy the Colinga from Mr. Hansen for # 120,000, which is approximately $ 265,000. Clauses four and five of the sales contract state that petitioner had 28 days from signing the agreement to conduct a survey of the yacht and, if any material defects were found, petitioner could recover the purchase price or obtain a price reduction sufficient to cover the defects. Petitioner hired Lockyer & Rich Limited, an English marine consulting firm, to perform an exhaustive survey of the Colinga's condition which was completed on September 31, 1979. After reading the survey, petitioner felt that it conformed to the Piggins', Mr. Hansen's, and Yachting Partners' representations of the Colinga's condition. In October 1979, petitioner's purchase of the Colinga became final. Immediately after title to the Colinga was transferred to petitioner, he purchased a 12-month insurance policy for the yacht from Sedgwick Marine Limited (hereinafter sometimes referred to as Sedgwick). The policy, dated October 12, 1979, was renewed in October 1980 and *348 October 1981. All three yearly policies list petitioner as the assured owner of the Colinga. Each insurance policy form states petitioner was to immediately advise Sedgwick if the policy was incorrect in any way. While petitioner held title to the yacht Colinga, he purchased, in his own name, a yacht berth at Port Vauban, in the city of Antibes, located near Nice on the southern coast of France. Petitioner hired Captain Piggin to be the Colinga's skipper and to oversee the repair and renovation of the yacht. He also hired Captain Piggin's wife, Heather, to be the Colinga's cook, bookkeeper, and interior designer. The Piggins only wanted to be associated with a yacht that was used solely for charters during the charter season because they required a 5-percent commission on "net charter income." Net charter income is the gross charter income less a 15-percent commission for the agent who found the charterer. Petitioner had a verbal agreement with the Piggins that they would work for petitioner for at least 5 years. After petitioner's purchase of the Colinga, he was in frequent contact with Captain Piggin to discuss the yacht's repairs, renovations, and related budgeting. In *349 order to protect a vessel from possible terrorism and to comply with various international laws, it is customary for the owner of an ocean-going vessel to officially enroll the vessel on the ship register of a home country. When petitioner purchased the Colinga, it was registered under the Norwegian flag, but due to the change in the Colinga's ownership, the yacht had to be re-registered. The Colinga could have been registered in the United States, France, Great Britain, Liberia, Malta, or Panama. Captain Piggin wanted the Colinga to fly the flag of Great Britain, since he and his wife were English. He also thought the British flag would be helpful in marketing the yacht to charterers. Initially, petitioner wanted to register the Colinga in the United States but discovered that, in order to do so, a vessel's owner must transport the vessel to the United States for inspection by the Coast Guard. Because of the expense and impracticality of transporting the Colinga to the United States, and the fact that Captain Piggin wanted to fly the British flag at the yacht's stern, petitioner decided to try to qualify the yacht to be registered in Great Britain. A vessel may only be listed *350 on the British Ship Registry by its owner, who must be either a resident person in the United Kingdom or a corporation organized under the laws of the United Kingdom. Since petitioner was an individual residing in Detroit, Michigan, he could not legally register the Colinga on the British Ship Registry in his own capacity. Petitioner, therefore, at the suggestion of Yachting Partners, contacted Bachmann & Co. Ltd. (hereinafter Bachmann & Co.), an international marine management consulting firm that specializes in qualifying vessels to be listed on ship registers of various countries, including Great Britain. Bachmann & Co. is based in the town of St. Peters Port on the British island of Guernsey, which is part of the Channel Islands chain situated off the coast of France. Bachmann & Co. sent petitioner a brochure entitled "International boat ownership and registration in the Channel Islands." The brochure outlines two alternative methods, "Programme A" and "Programme B," by which petitioner, as a foreign client, could qualify the Colinga for British ship registration by either organizing a corporation or establishing a discretionary trust, to which the title of the yacht would *351 be transferred. The brochure explains that, under Programme B, a foreign individual client could qualify for British ship registration by incorporating a company in Guernsey, "beneficially owned through the medium of nominees by their main Holding Company or by themselves privately." However, page four of the brochure states that under Guernsey law, if a corporation is beneficially owned by a foreign resident, "appropriate authorization must be obtained from the Exchange Control Department of the Bank of England." Programme A, as outlined in the brochure, requires the foreign yacht owner to establish a trust into which beneficial ownership of a yacht could be transferred. The brochure states, however, that under the laws of Guernsey and the terms of Bachmann & Co.'s standard deed of trust, the trust beneficiaries have no fixed rights to capital or income of the trust, "but merely have the right to be considered by the Trustees when they decide to distribute income or capital. As a result, beneficiaries of a Discretionary Trust have no legal right to any particular portion of the capital or income." The last page of the brochure contains the following caveat: "It must be made clear *352 that professional advice cannot be given to clients on their tax positions in Guernsey or elsewhere and that they should take advice from their own professional advisors as appropriate." In order to qualify the Colinga to be listed on the British Ship Registry, petitioner decided to organize a corporation under the laws of Guernsey. On November 26, 1979, petitioner executed a contract with Bachmann & Co., entitled "Management Agreement," instructing Bachmann & Co. to use the incorporation procedure outlined in the brochure that was sent to petitioner. On December 13, 1979, a corporation by the name of Charter Company Limited [2] was registered in Guernsey, Channel Island, United Kingdom. "Articles of Association" for the corporation, which are standard forms drafted by Bachmann & Co., were filed. According to the Articles of Association, the corporation's stated capital account is $ 10,000, divided into 10,000 shares worth $ 1.00 each; its registered office is located in Guernsey; and, at the time of registration, it had seven initial shareholders, who each held one share, and three directors. Petitioner did not personally know any of Charter Company Limited's shareholders or *353 directors who were all Bachmann & Co. personnel. During the years in issue, the corporation held no regular meetings of the shareholders or the directors at which decisions concerning the Colinga's operation were made, no shareholder votes were taken, and no minutes of meetings were kept. The Articles list the objectives of the corporation, which include the managing and chartering of boats and the carrying on of "businesses commonly carried on by ship-owners." Petitioner sent Bachmann & Co. annual fees for managing Charter Company Limited. The fees for Bachmann & Co.'s services were paid out of a checking account held in the name "Colinga II" which was maintained at City National Bank in Detroit, Michigan. Petitioner was the signatory for the checking account and deposited its funds. There is nothing in the record to indicate that petitioner followed the instruction appearing *354 on page four of Bachmann & Co.'s brochure, directing him to obtain appropriate authorization from the Exchange Control authorities of Guernsey, so as to be regarded as the beneficial owner of the corporation by the Guernsey government officials. At some point, petitioner, in the presence of his attorney, Eugene Gargaro, Jr., executed a document entitled "Settlement between Lawrence S. Charfoos & Charter Company Limited." The document purports to establish a trust and names petitioner as the settlor and Charter Company Limited as the trustee. However, the document is undated and does not name petitioner as a beneficiary. By the document's terms, the trust was initially funded with $ 100. Neither the Colinga, nor any other yacht, is mentioned in the document. On March 14, 1980, petitioner executed a bill of sale which purports to convey "64/64th shares" in the yacht Colinga to Charter Company Limited for a stated consideration of # 120,000, which is equal to approximately $ 263,888. The bill of sale was recorded with the British Port of Registry. Petitioner never collected the consideration recited in the bill of sale for the transfer of the Colinga's title to the corporation. *355 In March 1980, Charter Company Limited borrowed SwF320,000, equal to approximately $ 182,440, from Hill Samuel & Co. Limited (hereinafter Hill Samuel & Co.) to finance the purchase of the Colinga. The Colinga was pledged as security for the loan. In December 1979, petitioner had signed a separate agreement with Hill Samuel & Co. personally guaranteeing any future advances of funds lent to the corporation. On March 10, 1980, a certificate of British Registry was issued to Charter Company Limited. The Colinga remained on the British Ship Registry until the yacht was sold in 1986. The certificate of registration listed the corporation as the Colinga's owner. On April 3, 1980, Charter Company Limited officially changed its name to Colinga Limited in the Royal Court of the Island of Guernsey. For convenience and clarity, we shall hereinafter refer to the corporation as Colinga Ltd. Petitioner never advised his insurance company, Sedgwick Marine Limited, that he had transferred title to the yacht Colinga to the corporation, Colinga Ltd. After he sold the Colinga to the corporation, petitioner was advised by Yachting Partners that the assured in the insurance policies should not *356 be "Lawrence S. Charfoos," but rather, "Lawrence S. Charfoos and/or Colinga Limited, as their respective rights and interests may appear." Petitioner took no action pursuant to Yachting Partner's recommendation. During the winters of 1979-80 and 1980-81, major improvements and repairs on the Colinga were made at the direction of petitioner. The yacht was improved structurally by converting two single cabins into one large double cabin, making it more suitable for charter use. Mrs. Piggin obtained new cutlery, crockery, linens, carpets, curtains, and other items for the interior. Petitioner required Captain and Mrs. Piggin to obtain quotes for all the repairs and materials, and he subsequently approved or disapproved of their budgets. After the initial repairs and renovations were completed, the Piggins held a cocktail party for charter agents on the Colinga to attract charter business for the 1980 season. An American Express account was maintained by Captain Piggin in France for all the repair, renovation, entertaining, and numerous miscellaneous expenses incurred on the yacht Colinga. The American Express account was held in the name of "M.Y. Colinga II" and Captain Piggin *357 was the account's signatory. Petitioner regularly made deposits to the account. Whenever Captain Piggin needed additional money, he would telephone petitioner who would send additional funds to the account from Detroit. Captain and Heather Piggin regarded petitioner as the owner of the Colinga and took their directions from him. However, when the Piggins began booking charters for the Colinga in 1980, they consistently used the name of the corporation, Colinga Ltd., and not that of petitioner, in all their business dealings. Whenever Captain Piggin signed a charter contract with a booking agent or a chartering party, he signed on behalf of "Colinga Ltd." and not in the name of petitioner. Colinga Ltd. incurred expenses and obtained a radio license in its own name. In 1980, 1981, and 1982, Colinga Ltd. filed its Guernsey tax return, called an "annual list," with the registry office in Guernsey and paid its yearly # 300 corporate tax. In the 1980 and 1981 charter seasons, the Colinga charter operation generated cash losses of $ 117,840 and $ 64,051, respectively. Despite the losses, petitioner decided to add a second, smaller yacht to the operation in order to target the middle *358 class charter market. On October 14, 1981, Colinga Ltd., pursuant to a written yacht sale agreement, purchased a second yacht named the Sea Crest I (hereinafter Sea Crest) from the Walft A.G. Company. The stated purchase price was # 30,000, equal to approximately $ 55,590. Captain Piggin signed the sales agreement in the name of the corporation as owner. Petitioner's name does not appear on the Yacht Sale Agreement. Subsequently, when the Sea Crest was listed on the British Ship Registry, Colinga Ltd. was listed as her owner. The Sea Crest is a 58-foot motor yacht with charter accommodations for up to four people. Petitioner obtained no written appraisal of the fair market value of the Sea Crest prior to its purchase. The day-to-day chartering operations of the Colinga and the Sea Crest were carried on by their respective captains and crew who communicated regularly over the telephone with petitioner. Most of the Colinga's records and invoices kept by the Piggins were furnished to petitioner's law office in Detroit, Michigan, where his bookkeeper, Winifred Kissick, summarized them at the end of the year for petitioner's accountants. Petitioner did not submit any receipts *359 or records of expenses generated by the Sea Crest in 1981 and 1982. During the years in issue, petitioner personally used the yacht Colinga three times. He took 1-week cruises on the yacht in September 1980, May 1981, and September 1981. After the cruises, petitioner usually stayed for several days in France, where he had an apartment. On one occasion, petitioner gave his parents a 2-week cruise aboard the Colinga as a gift for their 50th wedding anniversary. On June 16, 1987, the Colinga was sold to Mari-Franc Property Inc. for $ 250,000. On November 17, 1986, the Sea Crest was sold to John L. Hurford for $ 47,934. On both occasions, Captain Barry Piggin signed the bills of sale in the name of the corporation, Colinga Limited, as the owner-seller. From 1980 through 1987, petitioner claimed deductions totalling $ 915,579 for the net yacht-chartering losses on his individual tax returns. In filing his individual tax returns for 1980, 1981, and 1982, petitioner consulted with his attorney, Mr. Eugene Gargaro, Jr., and also employed a certified public accountant, Mr. Donovan Miller. On his individual tax returns for 1980, 1981, and 1982, petitioner reported wage income from *360 his law firm, Charfoos & Charfoos, in the amounts of $ 624,173, $ 325,000, and $ 361,846, respectively. Petitioner claimed deductions for net losses from the yacht-chartering activity of $ 176,729, $ 114,980, and $ 148,804, for 1980, 1981, and 1982, respectively. Respondent disallowed petitioner's claimed deductions for the yacht-chartering losses on all three returns. On his 1980, 1981, and 1982 tax returns, petitioner claimed certain deductions for expenses related to his yacht-chartering activity, including depreciation of the yachts, business travel expenses, legal and professional fees, and "fitting out" expenses for renovation of the yacht Colinga. In the deficiency notice, respondent disallowed the deductions claiming that the expenses were attributable to the corporation, Colinga Ltd., in 1980, 1981, and 1982, and thus were not ordinary and necessary expenses attributable to a trade or business of petitioner. Alternatively, if the yacht-chartering losses are petitioner's losses, respondent disallowed the following deductions claimed by petitioner, resulting in increases to his taxable income. 1980
1981
1982
Fitting-out expenses
$ 24,466
--  --  Depreciation
51,875
$ 40,287
$ 31,901
Travel
7,307
10,752
--  Legal/professional
5,339
--  --  fees
*361 On his 1981 return, petitioner reported income from the Chandler Drilling 1978 Partnership in the amount of $ 13,324 and claimed a casualty loss deduction of $ 8,562 for damage to a boat other than the yachts Colinga and Sea Crest. In the notice of deficiency, respondent increased petitioner's share of income from the partnership by $ 9,923 and reduced his depletion expense in the amount of $ 2,173. Respondent also disallowed $ 4,000 of petitioner's claimed casualty loss on the ground that petitioner failed to establish that his basis in the boat was greater than $ 17,000. Finally, respondent imposed additions to tax for negligence and intentional disregard of the rules and regulations, pursuant to section 6653(a), and for the substantial understatement of income tax, pursuant to section 6661. OPINION Respondent asserts that petitioner was not entitled to deduct the net operating losses from the yacht-chartering activity on his 1980, 1981, and 1982 tax returns because in those years the losses are attributable to Colinga Ltd., a separate taxable corporation that petitioner organized, and not to petitioner as an individual. If we determine that the yacht-chartering losses are *362 attributable to petitioner individually, respondent asserts that petitioner is nonetheless not entitled to deduct the losses because he did not engage in the yacht-chartering activity with an objective to make a profit as required by section 183. In the event we determine that the losses are attributable to petitioner and that his yacht-chartering activity was carried on for profit, respondent argues that certain adjustments must be made to the Schedule C deductions petitioner claimed for the yachts' depreciation, the "fitting out" or yacht renovation expenses, and the travel, legal, and professional fee expenses incurred in connection with the yacht-chartering operation. Finally, respondent asserts that petitioner is liable for additions to tax for negligence and for substantially understating his income tax. Petitioner admits that in 1979 he created a foreign corporation, Charter Company Limited, later renamed Colinga Company Limited, and that the corporation held legal title to the yachts, "Colinga" and "Sea Crest," during the years in issue. Generally, income and deductions generated by property are taxable or deductible by the taxpayer who owns the property. Helvering v. Horst, 311 U.S. 112, 119, 85 L. Ed. 75, 61 S. Ct. 144 (1940); *363 Britt v. United States, 431 F.2d 227, 229 (5th Cir. 1970). Petitioner contends, however, that the operating losses sustained in the yacht-chartering activity are attributable to himself because the corporation was merely functioning as petitioner's agent and never held any beneficial interest in the yachts Colinga and Sea Crest. Petitioner further argues that there is plenty of evidence in the record to show he engaged in the yacht-chartering activity to make a profit and that he, therefore, is entitled to deduct the operating losses on his individual tax returns. Finally, petitioner asserts that respondent's determination of additions to tax is improper because he was not negligent and did not substantially understate his income tax for any of the years in issue. We must first determine whether the net operating losses and the Schedule C expenses generated by the yacht-chartering activity, and for which petitioner took deductions on his individual tax returns, are attributable to petitioner as an individual, or to Colinga Ltd., a corporation that petitioner formed and essentially controlled. In general, the statutory notice of tax deficiency is presumed to *364 be correct and petitioner bears the burden of proving respondent's determinations are in error. Rule 142(a). In particular, deductions are a matter of legislative grace and entitlement thereto must be shown by petitioner. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). We find it significant that petitioner took deliberate steps to incorporate his yacht-chartering operation. He hired Bachmann & Co., an international marine management consulting firm, to help him organize Charter Company Limited, which in December 1979 was registered as a corporation in Guernsey, Channel Islands, United Kingdom. The formalities of incorporation were followed: articles of incorporation were filed and directors and shareholders were named in the incorporation documents. Petitioner admits that in March 1980 he conveyed the Colinga's record title to the newly formed corporation and that in October 1981 the corporation purchased a second yacht, Sea Crest, in its own name. The corporation had a bona fide business purpose. By petitioner's own admission, its "sole purpose" was to qualify the yachts to be listed on the British Ship Registry, which could be accomplished only *365 by an individual owner residing in the United Kingdom or a corporation organized under the laws of the United Kingdom. Petitioner argues however, that given the corporation's limited purpose, to treat it as the owner of the yachts for tax purposes would be to exalt the corporate form over its substance. Petitioner's argument is not without some appeal, but we conclude it should not be accepted. It is fundamental that a corporation is a separate entity from its inception. We have said that "a corporate 'straw' may be used to separate apparent from actual ownership of property, without incurring the tax consequences of an actual transfer; but to prevent evasion or abuse of the two-tiered tax structure, a taxpayer's claim that his controlled corporation should be disregarded will be closely scrutinized. If the corporation was intended to, or did in fact, act in its own name with respect to property, its ownership thereof will not be disregarded." Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. 1977 U.S. App. LEXIS 14744, 39 A.F.T.R.2d (RIA) 934, 77-1 U.S. Tax Cas. (CCH) P9240 (2d Cir., Feb. 14, 1977).[3]
*366 In Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 87 L. Ed. 1499, 63 S. Ct. 1132 (1943), the U.S. Supreme Court refused to ignore the corporate form for tax purposes even though the corporation involved was completely dominated by its shareholder and appeared to lack beneficial ownership of its assets and income. The Supreme Court stated its rule of decision as follows: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * In Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 77 L. Ed. 399, 53 S. Ct. 198, * * * [it was held that] The choice of the advantages of incorporation to do business, * * * required the acceptance of the tax disadvantages. [319 U.S. at 438-439. Fn. refs. omitted.]
Petitioner concedes in his reply brief that "Colinga Ltd. is a separate entity *367 in conformity with Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 87 L. Ed. 1499, 63 S. Ct. 1132 (1943)," but argues that the yacht-chartering losses are nonetheless attributable to him individually because (1) the corporation functioned only as petitioner's agent and (2) the corporation never owned any beneficial interest in the yachts Colinga and Sea Crest. Generally, we agree that, if Colinga Ltd. were merely petitioner's agent or if petitioner had retained all but the bare legal title to the yachts, any income or expenses generated by the corporation's assets would be income and expenses of petitioner, as principal. Commissioner v. Bollinger, 485 U.S. 340, 99 L. Ed. 2d 357, 108 S. Ct. 1173 (1988). However, in this situation we find petitioner's claims to be inconsistent with his admission that Colinga Ltd. was a valid corporation in conformity with Moline Properties, Inc. v. Commissioner, supra.Petitioner states that the corporation's business purpose was to qualify the yachts to be registered on the British Ship Registry, which by law could only be accomplished by the yachts' owner who had to be either an individual residing in Great Britain or a corporation organized *368 under the laws of Great Britain. Furthermore, the Colinga and the Sea Crest were the only assets that were placed in the corpus of the corporation when it was registered. To now treat petitioner as the owner of the yachts for tax purposes appears to contravene Colinga Ltd.'s corporate existence. Even disregarding the inconsistencies in petitioner's argument, we find that the facts in this case do not support his claim that Colinga Ltd. functioned as his agent with respect to the yacht-chartering activity. The U.S. Supreme Court has stated that evidence of a purported agency relationship between a corporation and its principal must be unequivocal, Commissioner v. Bollinger, 485 U.S. at 349, and the Court in National Carbide Corp. v. Commissioner, 336 U.S. 422, 437-438, 93 L. Ed. 779, 69 S. Ct. 726 (1949), listed six conditions or factors that must be considered: (1) Whether the corporation operates in the name and for the account of the principal, (2) whether the corporation binds the principal by its actions, (3) whether the corporation transmits money received to the principal, (4) whether receipt of income is attributable to the services of employees of the principal *369 and to assets belonging to the principal, (5) whether the corporation's relations with its principal are dependent upon the fact that it is owned by the principal, and (6) whether its business purpose is the carrying on of the normal duties of an agent. In Commissioner v. Bollinger, supra, the Supreme Court upheld the six National Carbide factors, but added a further gloss for determining whether an agency relationship exists. In addition to the six National Carbide factors, the genuineness of an agency relationship is "adequately assured" when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is (1) set forth in a written agreement at the time the asset is acquired, (2) the corporation functions as agent and not as principal with respect to the asset for all purposes, and (3) the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset. [4]Commissioner v. Bollinger, 485 U.S. at 349-350. *370 In the record before us, we find no unequivocal evidence that Colinga Ltd. functioned as petitioner's agent with respect to the yacht-chartering activity. To the contrary, most of the six National Carbide factors that should be present to support a finding of an agency/principal relationship between a corporation and a taxpayer do not exist. First, Colinga Ltd. acted for its own account, not in the name of petitioner as its principal. National Carbide Corp. v. Commissioner, 336 U.S. at 437. The corporation purchased the yacht Colinga in its own name. It borrowed sufficient funds in its own name for the purchase and mortgaged the yacht Colinga as security for the loan. The yacht sale agreement to purchase the Sea Crest was executed by Captain Piggin on behalf of "Colinga Limited," not on behalf of petitioner. The corporation dealt with the British Government as principal and owner of the yachts Colinga and Sea Crest. Registry and licenses were acquired by the corporation in its own name for its own account. The corporation incurred its own debts, entered into contracts with third parties for the purchase of goods and services on its own account, and *371 sold property, including the yachts Colinga and Sea Crest, in its own name and not as petitioner's agent. Secondly, the corporation, Colinga Ltd., did not bind petitioner by its actions. National Carbide Corp. v. Commissioner, 336 U.S. at 437. The contracts entered into between charters and the corporation did not impose any duty or liability on petitioner. There is no evidence that the loans obtained and the property pledged by the corporation made petitioner personally liable on the debts. To the contrary, we note that in December 1979 the corporation's lending bank, Hill Samuel & Co., contracted with petitioner to personally guarantee the debts of the corporation, Colinga Ltd. Had petitioner been the principal, and Colinga Ltd. his agent, this guarantor contract would have been unnecessary. Third, it is unclear whether the gross receipts generated by the yachts were transmitted to petitioner. National Carbide Corp. v. Commissioner, 336 U.S. at 437. The corporation maintained a bank account in France. Captain Piggin, who had signatory authority for the corporation, had signatory authority over this account. Charter revenues were *372 deposited and expenses paid from this account. Books and records showing income and expenses, labeled "company a/c," were also maintained in France. The record before us does not persuade us that the fourth, fifth, and sixth National Carbide criteria for finding a corporate agency relationship exist in petitioner's case. The money petitioner received is not attributable to assets that he owned as principal. To the contrary, the corporation held the titles to both the Colinga and the Sea Crest. Moreover, Colinga Ltd. did not carry on the normal duties of an agent. Rather, its business purpose was to represent itself as the yachts' owner to Guernsey government officials so that the yachts could be enrolled on the British Ship Registry. Subsequently, the corporation held itself out as the yachts' owner to numerous business people and charter clients and transacted business in its own name. Petitioner claims that a document entitled "Management Agreement" between himself and Bachmann & Co., dated November 26, 1979, constitutes an agency agreement. However, we find that the terms of the management agreement do not support petitioner's assertion. The document only empowers *373 Bachmann & Co. to incorporate and administer Charter Company Limited, later renamed Colinga Ltd. The agreement does not provide that either the corporation or Bachmann & Co. will be the agent or nominee of petitioner. In contrast, the agency agreement in Commissioner v. Bollinger, 485 U.S. at 345, "expressly provided that the corporation would 'hold such property as nominee and agent for' the partnership * * * and that the partnership would have sole control of and responsibility for the * * * [asset]." No such written agreement exists in petitioner's case. Moreover, Colinga Ltd. did not have a corporate existence when the management agreement was executed and signed. Since the corporation was not registered until December 1979, 1 month after the management agreement was executed, the management agreement could not effectively bind the corporation to an agency relationship with petitioner, regardless of its terms. The evidence submitted by petitioner to support his claim that Colinga Ltd. functioned as his agent with respect to the yacht-chartering activity is unpersuasive and would require us to speculate as to actual events. Because such evidence of an *374 agency relationship is not only conjectural, but falls far short of being unequivocal, as required by the Supreme Court, we reject this claim. We are similarly unpersuaded by petitioner's second claim that the net operating losses from the yacht-chartering activity are attributable to himself individually because he, not the corporation, was the beneficial owner of the vessels utilized in the chartering operation. Specifically, petitioner asserts that no beneficial interest in the Colinga or the Sea Crest was transferred to the corporation and that it purchased only record title to the yachts. Again, we find that petitioner's assertion lacks a factual basis. "A significant element in determining ownership is the location of title to the property." Coleman v. Commissioner, 87 T.C. 178, 201 (1986), affd. without opinion 833 F.2d 303 (3d Cir. 1987). All the pertinent documentary evidence clearly shows that title to both yachts was unconditionally vested in the corporation. When petitioner sold the Colinga to the corporation, he executed a sales contract and bill of sale, in the presence of his attorney, Eugene Gargaro, Jr., specifically and unconditionally *375 transferring "64/64th shares in the ship" to the corporation. If petitioner, an experienced and seasoned products liability attorney, had meant to retain beneficial ownership of the Colinga, certainly one of these sales documents would refer to that fact. To the contrary, we find that the yacht sale contract and bill of sale unambiguously evince an intent to transfer the entire ownership interest in the Colinga to the corporation. Colinga Ltd. was also the legal and beneficial owner of the yacht Sea Crest. Pursuant to a written yacht sale agreement, dated October 14, 1981, Colinga Ltd. purchased the Sea Crest from Walft A.G. Company for a stated purchase price of # 30,000. Although petitioner claims he was the beneficial owner of the Sea Crest, we observe that petitioner's name does not appear in the yacht's chain of title or in the yacht sale agreement. Moreover, there is no evidence in the sales agreement that the seller, Walft A.G. Company, was transferring only legal title and retaining beneficial ownership of the yacht. The first clause on the second page of the agreement states that "the Seller shall sell and the Buyer shall purchase free from all charges and encumbrances *376 the Yacht specified in the Sale Particulars * * * subject to the terms and conditions of this Agreement including, where applicable, the Special Conditions specified." Under the section of the sales agreement entitled "Special Conditions" there is no indication that the parties intended the seller of the yacht to retain beneficial ownership. Petitioner asks us to ignore the form of the yacht sales documents and to find, based on the alleged substance or economic reality of the transactions, that no sale of the vessels to Colinga Ltd. ever took place. In support of his proposition that substance over form should control the determination of who owned the yachts for tax purposes, petitioner cites Frank Lyon Co. v. United States, 435 U.S. 561, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Karme v. Commissioner, 673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980); Falsetti v. Commissioner, 85 T.C. 332 (1985); Sundance Ranches, Inc. v. Commissioner, T.C. Memo 1988-535. However, these cases do not stand for the proposition that a taxpayer may disregard the form of his transaction. Rather, in each of the cases relied upon *377 by petitioner, it was the Commissioner who was challenging the form of the transactions. In the instant case, it is the taxpayer, not the Government, which seeks to disavow the form of the transaction. As we observed in Bolger v. Commissioner, 59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." We think this is particularly true where the yachts were transferred to the corporation in order to fulfill petitioner's specific desire to qualify them to be listed on the British Ship Registry and to fly the British flag at their sterns. The ability of a taxpayer to avoid the consequences of the form of a transaction is especially restricted in the Court of Appeals for the Sixth Circuit to which an appeal in this case would lie. The Sixth Circuit has adopted the rule of Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), cert. denied 389 U.S. 858, 19 L. Ed. 2d 123, 88 S. Ct. 94 (1967), which provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the *378 agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Schatten v. United States, 746 F.2d 319, 321-322 (6th Cir. 1984) (applying the rationale of Commissioner v. Danielson, supra, to property settlement agreement.) Under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940, 30 L. Ed. 2d 254, 92 S. Ct. 284 (1971), we are bound to apply the rule of the Sixth Circuit in this case. Thus, we find that the terms of both yacht sales agreements clearly and unambiguously transferred the legal and beneficial interests in the yachts Colinga and Sea Crest to the corporation, Colinga Ltd. We are not persuaded by petitioner's argument that the document which he executed purporting to be a settlement of trust, requires us to find that he held a beneficial interest in the yachts. The alleged trust is undated and appears to have only $ 100 in its corpus. Petitioner is not named as a beneficiary of the trust. Accordingly, we shall disregard it. We have found that petitioner organized the corporation, Colinga *379 Ltd., for the business purpose of registering the yachts in Great Britain, that the corporation was the legal and beneficial owner of the yachts Colinga and Sea Crest, and that the corporation conducted the yacht-chartering business in its own name. Having set up a separate entity through which to conduct his affairs, petitioner must live with the tax consequences of that choice. Indeed, the very exigency which led to his use of the corporation serves to emphasize the entity's separate existence. The tide of judicial history is too strong to enable petitioner to prevail on this issue, albeit that the purpose of the corporation was limited in scope. Therefore, we hold that the corporation, Colinga Ltd., was the owner of the yachts and the yacht-chartering operation for tax purposes and that the yacht-chartering losses are attributable to it, rather than petitioner in his individual capacity. Accordingly, we sustain respondent's disallowance of petitioner's claimed deductions of the chartering losses. Because we have determined that petitioner was not entitled to claim deductions for the yacht-chartering losses on his 1980, 1981, and 1982 individual tax returns, there is no need *380 for us to address the second issue of whether petitioner had the objective to make a profit in the yacht-chartering activity as required by section 183. The third issue we must decide is whether petitioner was entitled to deduct certain Schedule C expenses on his tax returns, disallowed by respondent in the following amounts. 1980
1981
1982
Fitting-out expenses
$ 24,466
--   --  Depreciation
51,875
$ 40,287
$ 31,901
Travel
7,307
10,752
--  Legal & professional
5,339
--   --  fees
In the deficiency notice, respondent first asserts that the deductions are not allowable because the expenses are attributable to the corporation, Colinga Ltd., and not to a trade or business owned by petitioner. In the alternative, respondent asserts that the deductions are not allowable because the yachting operation was not carried on by him for profit. If it is determined that petitioner owned the yacht-chartering operation and that the activity was carried on by him for profit, respondent asserts that: (1) the fitting-out expense deduction is nonetheless not allowable because it is a capital expenditure within the meaning of section 263; (2) the depreciation deduction *381 is not allowable because the Colinga has a salvage value equal to or greater than the cost and improvements to the yacht, or it has a useful life of 20 years instead of 10 years as reported on petitioner's returns; and (3) the travel, legal, and professional expense deductions are not allowable because petitioner failed to establish that they were ordinary and necessary expenses or expended for the purpose designated. In general, petitioner has the burden of establishing both his right to and the amount of a deduction. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). Specifically, petitioner must show why he is entitled to deduct an amount greater than that allowed by respondent. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Since we have determined that the corporation Colinga Ltd. owned the yachts Colinga and Sea Crest and the yacht-chartering operation in 1980, 1981, and 1982, the deductions claimed by petitioner for the above expenses related to the chartering operation are not allowable since they are the corporation's and not petitioner's expenses. Moreover, petitioner failed to introduce any documentary evidence or *382 give specific testimony explaining the specific nature and how he arrived at the specific amounts of his claimed deductions for travel expenses and the legal and professional fees. Therefore, we sustain respondent's determinations regarding these deductions. Welch v. Helvering, supra; Rule 142(a). The fourth issue for our decision is whether petitioner accurately reported income and a depletion expense from the Chandler Drilling 1978 partnership on his 1981 tax return. In the deficiency notice, respondent increased petitioner's share of income from the partnership by $ 9,923 and reduced petitioner's depletion expense by $ 2,173 for 1981. Petitioner failed to submit any documentary evidence to support the position taken on his tax return. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. This is especially true where, as here, the party failing to produce the evidence has the burden of proof." (Citations omitted.) Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *383 affd. 162 F.2d 513 (10th Cir. 1947). Thus, petitioner has not carried his burden of proving that respondent erroneously adjusted the partnership income and depletion expense reported on his 1981 tax return. Welch v. Helvering, supra; Rule 142(a). Accordingly, we hold that respondent's determinations regarding the partnership must be sustained. The fifth issue for our decision is whether petitioner correctly deducted $ 8,562 as a casualty loss for damage to a boat other than the Colinga or the Sea Crest on his 1981 tax return. In the deficiency notice, respondent disallowed $ 4,000 of petitioner's claimed casualty loss on the ground that petitioner failed to establish that his basis in the boat was greater than $ 17,000. Again, respondent's determination regarding the amount of the casualty loss is presumed to be correct and petitioner has the burden of proving otherwise. Welch v. Helvering, supra; Rule 142(a). Section 165 provides that a deduction may be taken for a casualty loss but limits the deduction to the lesser of (1) the decrease in the fair market value of the property due to the loss or (2) the taxpayer's *384 basis. Sec. 1.165-7(b)(1), Income Tax Regs. Since petitioner failed to introduce any evidence substantiating the casualty loss, he has not carried his burden of proving his entitlement to the casualty loss deduction. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165. Accordingly, we sustain respondent's disallowance of the deduction. The sixth issue for our decision is whether petitioner is liable for additions to tax under section 6653(a) in 1980 and section 6653(a)(1) and (2) in 1981 and 1982. Section 6653(a) and 6653(a)(1) provide that where any part of the underpayment of income tax is due to negligence or intentional disregard of the rules and regulations, an additional amount equal to 5 percent of the underpayment may be added to the tax. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest computed on the portion of the underpayment that is attributable to negligence or the intentional disregard of the rules and regulations. Negligence under these sections is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985) *385 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). As with respondent's determination of petitioner's underlying tax deficiencies, his determination of negligence or intentional disregard of the rules is presumed correct, and petitioner has the burden of proof to the contrary. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). After considering the particular circumstances of this case, we find that petitioner's underpayment of tax was not the result of a totally honest mistake; rather, it was caused by his negligence. Petitioner deliberately organized the corporation out of a business necessity. He signed numerous documents listing Charter Company, Limited, later renamed Colinga Ltd., as the owner of the yachts. He represented to the British Government that the corporation owned the yachts. It was not reasonable or prudent for him to then claim himself to be the owner of the yachts on his tax returns. We find it especially significant that petitioner is a seasoned attorney who specializes in personal injury and products liability law. His reputation as an attorney has allowed him to publish at least two law textbooks. *386 He also retained several experienced business advisers. Petitioner's expertise persuades us that he must have known that a corporation, if properly formed, takes on its own life as a separate entity for liability and taxation purposes. In short, petitioner must have been aware of the risk he was taking when he deducted the large yacht-chartering losses on his personal tax returns. Petitioner argues that he was not negligent in claiming the yacht-chartering deductions on his individual returns since he relied upon the advice of several attorneys and a certified public accountant in doing so. We have recognized that additions to tax for negligence are inappropriate where a taxpayer, in good faith, reasonably relies on his tax advisers. [5] The record, however, fails to establish that petitioner reasonably relied on a professional's advice after full disclosure. Petitioner testified that he consulted with his attorney, Eugene Gargaro, Jr., in claiming the chartering loss deductions. However, despite Mr. Gargaro's availability in Court, petitioner chose not to call him to the witness stand. The only reasonable inference from petitioner's failure to do so is that Mr. Gargaro's testimony *387 would have been unfavorable to petitioner. Wichita Terminal Elevator Co. v. Commissioner, supra.
Donovan Miller, the certified public accountant who prepared petitioner's 1980, 1981, and 1982 tax returns, did testify. However, Mr. Miller did not state that he independently made any determinations upon which petitioner could have relied. Rather, he testified that petitioner and his bookkeeper, Winifred Kissick, provided him with lists of items which he simply transferred to the returns. Petitioner has failed to carry his burden of proving that he was not negligent in claiming the deductions related to the yacht-chartering operation. Accordingly, we sustain the additions to tax as determined by respondent under section 6653(a) for 1980 and paragraphs (1) and (2) for 1981 and 1982. Finally, we must decide whether petitioner is liable for an addition *388 to tax of $ 13,211.11 under section 6661 for substantially understating his income tax on his 1982 return. Section 6661, as originally enacted in 1982, set the amount of the addition at 10 percent of the amount of any underpayment attributable to the substantial understatement. Section 8002 of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, amended section 6661(a) to increase the amount of the addition to 25 percent for additions assessed after October 21, 1986. An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. An "understatement" does not include an amount attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment." Sec. 6661(b)(2)(B)(i). Additionally, an understatement does not include any item for which there was adequate disclosure. Sec. 6661(b)(2)(B)(ii). We note that petitioner has not argued that respondent erroneously determined an addition to tax under section 6661 because petitioner adequately disclosed the yacht-chartering losses. Respondent asserts that he correctly *389 determined the addition to tax under section 6661 because substantial authority did not exist for petitioner's claim to the deduction of the yacht-chartering losses on his individual tax return. We have held that the yacht-chartering losses are attributable to the separately taxable corporation that petitioner created and not to petitioner in his individual capacity. The case law in existence in 1982 does not constitute substantial authority for petitioner's treatment of the yacht-chartering losses as his own. To the contrary, the Supreme Court in Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 87 L. Ed. 1499, 63 S. Ct. 1132 (1943), held that a corporation is a separate taxable entity if it was incorporated to take advantage of the laws of the State of incorporation or for another business purpose, or if it is followed by the carrying on of business activity. Charter Company Ltd., later named Colinga Ltd., was organized to take advantage of the laws of the United Kingdom governing the registry of yachts on the British Ship Registry, and subsequently carried on business activities in its corporate name. Clearly, petitioner created a "separate taxable entity" which, for tax purposes, *390 became owner of both the yachts and the yacht-chartering operation. Moline Properties Inc. v. Commissioner, supra.
Petitioner's arguments that the corporation functioned merely as his agent, and did not own any beneficial interest in the yachts, is also contrary to the weight of authority. In National Carbide Corp. v. Commissioner, 336 U.S. 422, 93 L. Ed. 779, 69 S. Ct. 726 (1949), the Supreme Court established six criteria for determining whether "unequivocal" evidence of a true agency or nominee relationship between a corporation and a principal exists. Applying those criteria, we found that the evidence of petitioner's alleged agency relationship with the corporation inadequate, unpersuasive, and certainly not "unequivocal." The evidence of petitioner's relationship with the corporation, Colinga Ltd., does not amount to the "adequate assurance" of a corporate agency relationship that existed under the facts of Commissioner v. Bollinger, 485 U.S. 340, 99 L. Ed. 2d 357, 108 S. Ct. 1173 (1988). Here, there is no unambiguous, written agency agreement between the corporation and petitioner as there was in Bollinger, and the corporation was not held out as an agent in all its *391 dealings with third parties. Moreover, there is no substantial authority to support petitioner's argument that the corporation never held any beneficial interest in the yachts. Rather, the pertinent legal authorities, as well as the documentary evidence and other facts, persuade us that petitioner transferred all of his interest in the Colinga to the corporation for a valid business purpose and that the corporation subsequently bought the legal and beneficial interests in the Sea Crest. Schatten v. United States, 746 F.2d 319, 321-322 (6th Cir. 1984) (following Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967)); Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Therefore, we hold that substantial authority did not exist for petitioner's treatment of the yacht charter operating losses as his own losses on his 1982 tax return. Accordingly, we sustain the addition to tax determined by respondent under section 6661. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 70,555.45. ** 50 percent of the interest due on $ 52,844.43.↩
2. On April 3, 1980, Charter Company Limited officially changed its name to Colinga Limited in the Royal Court of the Island of Guernsey.↩
3. See also Sparks Farm, Inc. v. Commissioner, T.C. Memo 1988-492, 1988 Tax Ct. Memo LEXIS 518, 56 T.C.M. (CCH) 464↩, 473, T.C.M. (RIA) 88492, at 2522, 2532.
4. In their briefs, both parties erroneously assume that the three factors enunciated in Commissioner v. Bollinger, 485 U.S. 340, 349-350, 99 L. Ed. 2d 357, 108 S. Ct. 1173 (1988), is a dispositive test of an agency relationship between a corporation and its principal. However, we have recently stated that the language in Bollinger does not list requirements for agency status, but rather describes factors which lead to the conclusion that agency status existed in that case. See Advance Homes, Inc. v. Commissioner, T.C. Memo 1990-302, 1990 Tax Ct. Memo LEXIS 320, 59 T.C.M. (CCH) 906↩, 909, T.C.M. (RIA) 90302 at 1421, 1424.
5. See Kozikowski v. Commissioner, T.C. Memo 1986-364; Horstmier v. Commissioner, T.C. Memo 1983-409↩.